Eric S. Dwoskin (*pro hac vice*)
edwoskin@dwowas.com
**DWOSKIN WASDIN LLP**
433 Plaza Real, Ste. 275
Boca Raton, Florida 33432
Tel.: 561-849-8060

Robert G. Loewy (SBN 179868)
rloewy@rloewy.com
**LAW OFFICES OF ROBERT G. LOEWY, P.C.**
20 Enterprise, Suite 310
Aliso Viejo, CA 92656
Tel: (949) 468-7150

Attorneys for Plaintiff
and the Proposed Classes

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUELLEN CRANO, individually and on behalf of other similarly situated individuals,<br><br>Plaintiff,<br><br>vs.<br><br>SOJERN, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 3:25-CV-2600-JSC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR**<br><br>**(1) CALIFORNIA INVASION OF PRIVACY ACT (Cal Penal Code § 631(a));**<br>**(2) UNFAIR COMPETITION LAW (Cal. Bus & Prof. Code §§ 17200, *et seq*.)**<br>**(3) UNJUST ENRICHMENT;**<br>**(4) ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. § 2511(1), *et seq*.)**<br>**(5) INVASION OF PRIVACY**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Suellen Crano, individually and on behalf of all others similarly situated (the "Class Members"), brings this amended class action complaint against Sojern, Inc. ("Defendant" or "Sojern"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, including based on the investigation of counsel.

**NATURE OF THE ACTION**

1. This is a class action lawsuit brought on behalf of all California residents who have booked a hotel room in a hotel that is part of an illicit web tracking marketing enterprise run by Sojern.

2. Sojern's web tracking enterprise illicitly tracks hotel guest's guest records across the internet without consent, and then uses that information to send direct solicitations—all unbeknownst to the guests.

3. Sojern is eavesdropping on communications sent and received by Plaintiff and Class Members to hotels, including communications that contain sensitive and confidential "guest records" as defined by Cal. Civil Code § 53.5. By intercepting these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") § 631 and other California and federal laws.

**THE PARTIES**

4. Plaintiff Suellen Crano is a resident and citizen of Upland, California. During the relevant period of time, Plaintiff booked Hilton and Marriott hotel rooms online on Hilton.com (the "Hilton Website") and Marriott.com (the "Marriott Website"), respectively. While in California and using her computer located in California, Plaintiff: (a) accessed the Hilton Website, including on or around April 4, 2024, and searched for and booked hotel rooms at Hilton properties, including hotel rooms at Hilton properties located in California; and (b) accessed the Marriott Website, including on or around August 2, 2023, and searched for and booked hotel rooms at Marriott properties, including hotel rooms at Marriott properties located in California. Plaintiff accessed the Hilton Website and Marriott Website using the

Chrome web browser on her computer located in California. Unbeknownst to Plaintiff, Defendant Sojern offers hotels, like Hilton and Marriott, an online tracking technology that, when placed on a hotel's website, causes tracking software to be installed on the consumer's computer that intercepts the consumer's communications with the hotel and discloses those communications to Sojern, and Hilton and Marriott had each installed Sojern's tracking technology on their websites. Through the systematic process described in more detail below, Sojern intercepted Plaintiff Crano's communications with the Hilton and Marriott Websites—including communications that contained Plaintiff Crano's confidential "guest records," as defined by Cal. Civil Code § 53.5—as they were being sent by Plaintiff Crano from her computer in California. The communications intercepted by Sojern included unique identifying numbers alongside information that identified the relevant hotel ID, hotel name/location, hotel room price, number of rooms, check in date, check out date, and the fact that Plaintiff Crano completed her reservations. Plaintiff Crano did not consent to these interceptions. As a result of booking Hilton hotel rooms in the past, Plaintiff Crano presently has "Hilton Honors" points that can be exchanged toward the cost of future Hilton hotel room reservations. Plaintiff Crano anticipates using those points in the future by booking additional hotel rooms on the Hilton Website, but cannot presently do so without Defendant unlawfully intercepting her communications with Hilton. As a result of booking Marriott hotel rooms in the past, Plaintiff Crano presently has "Marriott Bonvoy" points that can be exchanged toward the cost of future Marriott hotel room reservations. Plaintiff Crano anticipates using those points in the future by booking additional hotel rooms on the Marriott Website, but cannot presently do so without Defendant unlawfully intercepting her communications with Marriott.

5. Defendant Sojern, Inc. is a Delaware corporation with its principal place of business located at 545 Market Street, Floor 4, San Francisco, CA 94105.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

7. The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. Plaintiff accessed and navigated the Website while in California, where her communications were intercepted by Defendant in this District.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I. California Civil Code § 53.5

9. Pursuant to California Civil Code § 53.5(a), hotel operators (and agents thereof) who offer or accept payment for hotel rooms "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order." Cal. Civil Code § 53.5(a).

10. Per Cal. Civil Code § 53.5(c), the term "guest record" includes "any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number."

11. The legislative history of § 53.5 indicates:

a. In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

b. Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

c. Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; ***or stay at a hotel or motel***.

d. California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

e. Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a consumer has, where a consumer lives and works, where a consumer travels and ***where they stay on their trip***, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

f. The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial

fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

g. When Californians leave their homes to travel via bus ***or stay at lodging establishments throughout their state***, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure.

h. ***Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses***.

i. Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018) (emphases added).

12. Thus, "guest records" identifying website users as hotel customers or guests are confidential and, under California law, cannot be disclosed to a third party absent a court-issued subpoena, warrant, or order.

**II. The California Invasion of Privacy Act**

13. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

14. As the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his

> confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and ***its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device***.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

15. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire, line, cable or instrument," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

16. Individuals may bring an action against the violator of CIPA § 631 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## III. Sojern Eavesdrops on Californians' Communications in Violation of CIPA

### A. *Background on Web Browsers, Source Code, & Sojern Tracking Pixel.*

17. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

18. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

19. When an individual uses a web browser to navigate to a website, a number of communications occur between the user's computer and the server that hosts the website. The messages between the user's computer and the server that hosts the website include the following contents:

a. *A "GET request" sent from the user's computer to the website server, and a responsive "POST" request sent from the website server to the user's computer* When an individual internet user visits a web page, his or her web browser sends a message called a "GET request" to the webpage's server. The GET request tells the website what information is being requested and then instructs the website to send the information back to the web browser on the user's computer, which the website does via a responsive "POST request" sent to the users' web browser. The GET and POST requests include the content the user requested the website to display.

b. *The URL*. The uniform resource locator, or URL, is the location of the requested content on the web server. The URL of a webpage is typically shown in the address bar of the user's browser. URLs often use plain language to describe the associated content (*e.g.*, www.website.com/descriptionofcontentonpage).

c. *The IP address of the user's connection to the internet.* IP stands for "Internet Protocol." When connected to the Internet, each device is assigned a unique IP address by the Internet Service Provider ("ISP") that is providing the internet connection. IP addresses may change over time but often do not. In many cases, an ISP will continue to assign the same IP address to the same device.

d. *Information on the User Agent*. A user agent is the hardware and/or software responsible for retrieving the requested content, such as the device, operating system and web browser.

e. *A Timestamp*. A timestamp is the time of a request or event that a computer records. The timestamp displays when certain information was requested or exchanged.

20. The set of instructions that commands the browser is called the source code. In addition to exchanging the above communications with users' computers, websites can also cause tracking technologies (often referred to as "cookies" or "tracking pixels") to be installed on the accessing users' computer. These technologies are small files that the website places on the user's web browser to collect data about the user's online activity. These technologies work by assigning or associating the user with a unique identifier, storing that identifier with other information about the user (*e.g.*, geographic location, device specifications, etc), gathering data on the user's activity on the website in real time, and transmitting that data to the host website and the third-party technology vendor. Two of the primary reasons website operators use these technologies is to (a) track user's activity on the website; and (b) enable the website host to subsequently serve the website user with targeted advertising across the internet.

21. By directing user's data, activity, and communications with the website to third-party technology vendors, these technologies effectively open a spying

window through which a website funnels data about users and their actions to third parties in real time.

22. Tracking technologies are installed by web developers on pages of the websites they host that are run on the host's servers.

23. When a user accesses a website that has tracking technology, the website deploys tracking technology onto the web browser on the user's computer in the location in which the computer is located (in this case, in California).

24. The third parties to whom the website transmits data through the tracking technology do not provide any substantive content relating to the user's communications. Instead, these third party tracking technologies are typically configured to track user data and communications for marketing and other pecuniary purposes.

25. Thus, without any knowledge, authorization, or action by a user, a website developer like Hilton and Marriott can use its source code to commandeer the user's computing device, causing the device to contemporaneously in real time and invisibly re-direct the users' personally identifiable guest records and communications to third parties like Sojern.

26. When a user accesses a website hosting a tracking technology, the tracking technology is surreptitiously installed on the user's computer and thereafter directs the user's browser to transmit the users' communications with the website to the third-party technology provider (in this case, in California).

27. This secret transmission to the third-party technology provider contains the communications exchanged between the website user and the host website (*e.g.*, the "GET request" and a "POST request"), along with additional data that the tracking technology is configured to collect (*e.g.*, unique identifiers that allow the technology providers to associate the collected data with the individual website user).

28. The communications transmitted to the third-party technology vendor include those contents described in Paragraph 19, including the GET and POST requests, the webpage's Universal Resource Locator ("URL") and metadata, and user IP address.

29. This transmission is initiated by a tracking tool's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read the host website—the website host's own code (which communicates with the user's web browser to deliver the requested web content), and a tracking tool's embedded code (which captures those communications and combines them with other information about and identifying the user).

30. Once the third-party technology vendor collects the information contained in the website user's communications with the host website, the third-party can store and use the information for various purposes of their own, including pecuniary purposes and facilitating targeted advertising.

31. On a technical level, that is how Sojern's technology deploys to intercept Plaintiff and the Class's communications with the hotels in Sojern's marketing enterprise.

**B. An Overview of Sojern's Marketing Enterprise**

32. Sojern allows hotels to identify and advertise to in-market travelers for purposes of online behavioral advertising and to optimize advertising campaigns across multiple channels and devices.

33. To do so, Sojern tracks travelers across devices and browsers using a technology referred to herein as the Sojern Tracking Pixel.

34. Sojern offers the Sojern Tracking Pixel so that hotels will install it on their websites and other online properties.

35. Once installed on a hotel's online property, the Sojern Tracking Pixel automatically collects personal information from guests visiting hotel's websites and shares that information with Sojern.

36. The personal information collected by the Sojern Tracking Pixel from hotel website user's computers includes the user's communications with the hotel website and a cookie ID, mobile advertising ID (MAID), TV identifier, email address, and other persistent alpha-numerical unique identifiers, which are shared alongside other information, such as IP address, device type, browser type, date and time stamp of clicks and web visits, detailed referrer URLs, and other technical information. Like an address or social security number, the user-specific values transmitted to Sojern through the Sojern Tracking Pixel that the hotel causes the users' browsers to disclose identify the individual website users in the real world. Additionally, when Sojern provides direct email marketing services, the hotel causes the users' browsers to disclose users' email addresses that Sojern collects in plain text.

37. Sojern uses this information to create custom audiences for hotel advertising campaigns.

38. Sojern also uses the information collected for its own internal business purpose, including research and product development and improvement.

39. Sojern tracks travelers at every stage of the booking process (including through reservation) to profile, find and target guests to drive hotel revenue and otherwise for the hotels' and Sojern's financial benefit.

40. In other words, Sojern operates a "data lake" where it collects as much information relating to a hotel guest as possible all from different sources (including offline booking data (*e.g.*, call center, walk-in, travel agent bookings), stores that information in a centralized location (including, in its servers in California) where it matches data points and creates detailed profiles on individuals, and then uses those

profiles to send direct, targeted advertisements from hotels even when the user did not authorize it.

### C. Sojern Eavesdrops on Californians' Communications with Hotels, including Hilton and Marriott

41. To illustrate how the Sojern illicit marketing enterprise works, take the example of Hilton and Marriott hotels.

42. Hilton owns and operates the Hilton Website. Hilton has integrated the Sojern Tracking Pixel into Hilton's Website.

43. Marriott owns and operates the Marriott Website. Marriott has integrated the Sojern Tracking Pixel in Marriott's Website.

44. On the Hilton and Marriott Websites, website users can, among other things, browse and book hotel rooms at Hilton and Marriott properties throughout California.

45. When doing so, website users communicate confidential information to Hilton and Marriott, including their names, the properties and hotel rooms requested and booked, and the dates of their stay. This information includes "guest records" identifying the individual users as hotel guests, boarders, occupants, lodgers, customers, or invitees.

46. Unbeknownst to Plaintiff and Class Members, however, Sojern is eavesdropping on those confidential communications with Hilton and Marriott.

47. Hilton and Marriott Website users' communications with those hotels are the product of website users affirmatively entering, and interacting with, information on the hotel websites (*i.e.*, the communications are not automatically generated). Instead, as set out below, the communications stem from website users conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created by and in response to website users' communicative inputs; information created by and in response to website users' intended messages to Hilton and Marriott regarding, among other things, the

properties and hotel rooms being searched for and booked; and information created by and in response to website users' having conveyed and expressed their respective desires that the websites would supply them with certain, highly personalized, types of information and/or responses.

48. Hilton and Marriott Website users may browse and book hotel rooms on the Hilton and Marriott Websites. To do so, they select the hotel at which they would like to book, the desired dates for their trip, and the price they are willing to pay. Sojern contemporaneously intercepts website users' communications with the Hilton and Marriott Websites regarding such items.

49. Sojern collects, alongside unique identifying numbers, at least the following information from hotel guests booking Hilton and Marriott hotel rooms through the Hilton and Marriott Websites:

a. Hotel ID;
b. Hotel name/location;
c. Hotel room price;
d. Number of rooms;
e. Check in date;
f. Check out date; and
g. The fact a reservation was completed.

50. Although the above example relates to a booking on Hilton's and Marriott's Website, the Sojern Tracking Pixel operates on many other hotel websites operated by hotel chains that participate in Sojern's marketing enterprise, including, among others, Best Western and Fairmont. Sojern eavesdrops on guest's communications with other hotels in its marketing enterprise in a substantially similar manner, and obtains the same types of information related to guest communications.

51. Sojern pairs the event data with a user's identity using various unique IDs, including IDs referred to as a cid, apnid, ttdid, adfid, ccid, uid2.0, and email addresses when supplied by the hotel chain.

52. Sojern refers to these and other IDs as targetable identifiers that work by providing a way to recognize and differentiate individual users online that are designed to evade third-party cookie blockers.

53. Sojern cookie syncs with other companies, such as Facebook, Google, and YouTube to show guests ads.

54. Sojern uses these cookies to pair event data with personally identifiable information so it can later retarget consumers. (Think of browsing a hotel room and then later seeing advertising for that hotel room on Facebook.)

55. By compelling a visitor's browser to disclose event data for booking, alongside the unique individual identifiers described above, Defendant willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within California and uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

## IV. The Value of the Data Taken from Plaintiff

56. Sojern profits from its use of Plaintiff's and Class member's personal data to target them with advertising and for other economic benefits.

57. The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech industry. A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge." That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

58. The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this complaint, including as early as 2013, with its publication "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[1] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[2]

59. In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[3] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

60. Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer

---

[1] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[2] https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

[3] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

information.[4]

61. Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[5]

62. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are

---

[4] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

[5] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[6]

63. The cash value of the personal user information unlawfully collected by Defendant provided during the Class Period can be quantified. For example, a group of researchers studied the value that internet users place on their online browsing history and concluded that users value items of their online browsing history at $10.[7]

64. Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

65. User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get

---

[6] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

[7] Juan Pablo Carrascal, et al., *Your browsing behavior for a big mac: economics of personal information online*, Proceedings of the 22nd International Conference on the World Wide Web, available at https://dl.acm.org/doi/abs/10.1145/2488388.2488406.

information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

66. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

67. A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

a. Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[8]

b. Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[9]

---

[8] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[9] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[10]

d. Killi is a new data exchange platform that allows you to own and earn from your data.[11]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[12]

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[13]

68. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[14]

---

[10] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[11] https://killi.io/earn/.

[12] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[13] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[14] Kari Paul, *Google launches app that will pay users for their dat*a, The Guardian

69. The California Consumer Privacy Act (CCPA) recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

**V. Defendant Was Unjustly Enriched from the Use of the Sojern Tracking Pixel**

70. The sole purpose of the use of the Sojern Tracking Pixel is marketing and profits.

71. Through its false representations and unlawful data collection, Defendant is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how they would monetize their own data.

72. Through its false representations and unlawful data collection, Defendant is unjustly enriching itself based on the value of Defendant's unauthorized access to Plaintiff's and Class members' data and communications resulting from Defendant's wrongful conduct. This value is analogous to the value

---

(June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacystudy; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-datatechcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-prounanciations-app.

for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of value is appropriate here under common law principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class members have a protectible property interest in their data and communications; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

73. Defendant uses customers' guest records to generate revenue. This revenue can come by way of using the data it collects to deliver its own services more effectively, selling the data it collects to third parties so that they can direct targeted advertisements to customers, or sharing the data it collects to companies that intend to direct advertisements to customers on websites with Sojern's marketing enterprise thereby generating additional advertising revenue for Defendant. The fact that Defendant generates this revenue is verification that customer's guest records are financially valuable within the online environment where they are exchanged. The value generated by customers' guest records, while small to the customers, is substantial to Defendant. Nevertheless, Defendant does nothing to compensate consumers for the use of their guest records. Nor does Defendant obtain the consent of its customers to sell or share this data. This conduct dilutes the value of its guests' data and deprives guests of their value.

## VI. Delayed Discovery & Tolling

74. Each unauthorized collection of private, personal data by Defendant is a separate "wrong" which triggers anew the relevant statute of limitations.

75. Further, all applicable statutes of limitation have been tolled by operation of the delayed discovery doctrine, which delays accrual until Plaintiff have, or should have, inquiry notice of the cause of action. Plaintiff and Class members were not on inquiry notice despite acting with reasonable diligence. Plaintiff do not have the expertise in identifying and interpreting the underlying coding and the operation of the Sojern Tracking Pixel in order to discover Defendant's wrongful conduct.

76. Plaintiff did not discover and could not reasonably have discovered that Defendant was collecting, storing, and using their personal, private data in the ways set forth in this Complaint until she consulted with counsel—shortly before the Complaint was filed.

77. Upon learning about counsel's investigation into Defendant's improper collection, storing, and use of their personal, private data, Plaintiff diligently sought to uncover the facts, including by consulting with, and hiring, knowledgeable counsel to bring this case.

## CLASS ACTION ALLEGATIONS

78. Plaintiff seeks certification of the following class:

All California residents who had their personal information collected by Sojern while booking an inn, hotel, motel, or lodginghouse (the "Class").

79. Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

80. The proposed Class excludes any officers and directors of Defendant; Class Counsel; and the judicial officers presiding over this action and the members of their immediate family and judicial staff.

81. **Numerosity, Fed R. Civ. P. 23(a)(1)**: The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

82. **Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**: There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class. The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant violated CIPA § 631; and

b. Whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

83. **Typicality, Fed. R. Civ. P. 23(a)(3)**: The claims of the named Plaintiff are typical of the claims of the Class because Plaintiff, like all other class members, had her confidential electronic communications intercepted and disclosed to Sojern.

84. **Adequacy, Fed. R. Civ. P. 23(a)(4)**: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

85. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**: The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies

the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Numerous consumers were cheated out of small sums of money through deliberate behavior of Defendant that they could not practically recover in individual suits. Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

86. **Policies Generally Applicable to the Class**. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

87. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is

representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

88. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

89. **Ascertainability & Notice**. Membership in the Class can be determined by objective records maintained by Defendant and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

90. **Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**. Unless a Class-wide injunction is issued, Defendant will continue to intercept "guest records" and other sensitive communications of Class Members, and otherwise Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## CAUSES OF ACTION

### Count I

### Violation of the California Invasion of Privacy Act

### Cal. Penal Code § 631(a)

91. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

92. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

93. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

94. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1

(9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

95. The Sojern Tracking Pixel is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

96. Sojern is not a party to website user's communications with hotel websites. Sojern is an independent entity that provides tracking technology hotels can use to intercept communications with hotel guests. Sojern's technology does not merely passively record the communications for the hotel's benefit. Rather, Sojern has the capability to use the information it collects via the Sojern Tracking Pixel for its own purposes, and, in fact, does use that information for its own purposes, including research and development of products that Sojern markets and sells to other hotels. Accordingly, Sojern is a third party to any communication between Plaintiff and Class Members, on the one hand, and the hotels that participate in the Sojern marketing enterprise, on the other.

97. At all relevant times, by its Sojern Tracking Pixel, Sojern willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and the hotels that participate in the Sojern marketing enterprise, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

98. At all relevant times, Sojern used or attempted to use the communications intercepted by its Sojern Tracking Pixel to promote and improve its advertising platform.

99. Plaintiff and Class Members did not provide their prior consent to Sojern's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.

100. Sojern's eavesdropping on Plaintiff and Class Members' communications occurred in California, where Plaintiff and Class Members accessed the hotels within the Sojern marketing enterprise and where Sojern is headquartered and collects Plaintiff's and Class Members' electronic communications on its servers.

101. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a) and injunctive relief to stop the violations alleged herein.

## <u>Count II</u>

### Unfair Competition Law ("UCL")

### Bus. & Prof. Code §§ 17200, *et seq*.

102. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

103. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

104. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (UCL). By engaging in the practices aforementioned, Defendant has violated the UCL.

105. Defendant's "unlawful" acts and practices include its violation of the California Invasion of Privacy Act, Cal. Penal Code § 631; and Cal. Civil Code § 53.5.

106. Defendant's conduct violated the spirit and letter of these laws, which protect privacy interests and prohibit unauthorized collection of private, personal data and communications.

107. Defendant's "unfair" acts and practices include its violation of privacy interests protected by the statutes identified above. To establish liability under the

unfair prong, Plaintiff and Class members need not establish that these statutes were actually violated, although the claims pleaded herein do so.

108. Defendant's conduct constitutes unfair business practices under the UCL because these practices offend established public policy and hurt Plaintiff and class members, which cannot be reasonably avoided, and that outweighs any benefit to consumers or competition. The conduct also is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

109. Defendant's appropriation of class members' private, personal data and communications was to its economic and commercial advantage. Defendant has generated substantial revenue from this unlawful practice through its provision of targeted advertising.

110. At no time has Defendant affirmatively sought consent from class members before appropriating their private, personal data and communications.

111. Plaintiff and class members received no compensation from Defendant's use of their private, personal data and communications.

112. California's UCL allows anyone to bring an action for injunctive relief if they have "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. § 17204.

113. Plaintiff lost money or property because of Defendant's unfair and unlawful practices in violation of the UCL. If not for its violation of the law, Defendant would have paid Plaintiff and Class members for consent to use their personal information and communications or ceased such use.

114. Defendant's actions caused damage to and loss of Plaintiff's and Class members' right to control the dissemination and use of their personal information.

115. Plaintiff's and class members' private, personal data and communications are likely to remain available to Defendant, without Plaintiff's and class members' consent, and without compensation from Defendant for its

appropriation and use. Indeed, the longer Defendant is allowed to continue its practices the more information that it can unfairly and unlawfully collect.

116. Plaintiff seeks an order to enjoin Defendant from such unlawful, unfair and fraudulent business acts or practices and to restore to Plaintiff her interest in money or property that might have been acquired by Defendant through unfair competition.

117. Defendant reaped unjust profits and revenues in violation of the UCL. This includes Defendant's profits and revenues from their targeted advertising. Plaintiff and the Class seek restitution and disgorgement of these unjust profits and revenues.

118. Plaintiff pleads this claim separately as well as in the alternative to her claims for damages under Federal Rule of Civil Procedure 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of Sojern on the damages claims, Plaintiffs will have no adequate legal remedy.

## Count III

## Unjust Enrichment

119. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

120. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

121. Plaintiff and Class members conferred a benefit on Defendant in the form of personal, private data which has substantial monetary value that Defendant extracted and used to produce revenue and unjustly retained those benefits at the expense of Plaintiff and Class members.

122. Defendant collected and used and made available this information for their own gain, reaping economic, intangible, and other benefits.

123. Defendant unjustly retained those benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class

members, all without providing any commensurate compensation to Plaintiff and Class members.

124. Plaintiff and Class members did not consent to the collection and use of their personal, private data, nor did they have any control over its use. Therefore, under principles of equity and good conscience, Defendant should not be permitted to retain any money derived from their use of Plaintiff and Class members' personal, private data.

125. The benefits that Defendant derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles to permit Defendant's retention of any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

126. Plaintiff pleads this claim separately as well as in the alternative to her claims for damages under Federal Rule of Civil Procedure 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of Sojern on the damages claims, Plaintiffs will have no adequate legal remedy.

## Count IV

**Violations Of Electronic Communications Privacy Act ("ECPA")**

**18 U.S.C. § 2511(1) *et seq*.**

**Unauthorized Interception, Use and Disclosure**

127. Plaintiff and Class Members repeats and re-alleges each and every allegation in the Complaint as if fully set forth herein.

128. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

129. The ECPA protects both sending and receipt of communications.

130. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

131. The transmissions of Plaintiff's guest records to Sojern qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

132. **Electronic Communications**. The transmission of guest records between Plaintiff and Class Members and Sojern are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

133. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

134. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

135. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices (including mobile devices);

c. Defendant's web-servers;

d. Defendant's Website; and

e. The Sojern Tracking Pixel codes deployed by Hilton and other hotels in the Sojern marketing enterprise to effectuate the sending and acquisition of guest communications.

136. By utilizing and embedding the Sojern Tracking Pixel on websites within the Sojern marketing enterprise, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff's and Class Members', in violation of 18 U.S.C. § 2511(1)(a).

137. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Sojern Tracking Pixel, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' guest records to Sojern.

138. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding guest records.

139. By intentionally intercepting or endeavoring to intercept or procuring Hilton and other hotels in the Sojern marketing enterprise to intercept the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

140. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

141. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

142. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Sojern Tracking Pixel to track and utilize Plaintiff's and Class Members' guest records for financial gain.

143. Defendant was not acting under color of law to intercept Plaintiff and Class Member's wire or electronic communication.

144. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Sojern Tracking Pixel tracking codes.

145. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

146. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to guest records, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (ii) violation of California Invasion of Privacy Act, Cal. Penal Code § 631; and Cal. Civil Code § 53.5.

**Count V**

**Invasion of Privacy**

147. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

148. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

149. The right to privacy in California's constitution creates a right of action against private entities such as Defendant.

150. Plaintiff's and Class members' expectation of privacy is deeply enshrined in California's Constitution. Article I, section 1 of the California Constitution provides:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and

obtaining safety, happiness, and privacy.

151. The phrase "and privacy" was added by the "Privacy Initiative" adopted by California voters in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Critically, the argument in favor of Proposition 11 reveals that the legislative intent was to curb businesses' control over the unauthorized collection and use of consumers' personal information, stating:

> The right of privacy is the right to be left alone… It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[15]

152. The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

153. To plead a California constitutional privacy claim, a plaintiff must show an invasion of (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

154. As described herein, Defendant has intruded upon the following legally protected privacy interests:

i. The federal Wiretap Act (ECPA), California Wiretap Act, the Guest Records Statute, and other California common-laws as alleged herein;

---

[15] BALLOT PAMP., PROPOSED STATS. & AMENDS. TO CAL. CONST. WITH ARGUMENTS TO VOTERS, GEN. ELECTION *26 (Nov. 7, 1972).

ii. A Fourth Amendment right to privacy contained on personal computing devices, including web-browsing history, as explained by the United States Supreme Court in the unanimous decision of *Riley v. California*; and

iii. The California Constitution, which guarantees Californians the right to privacy;

155. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiff and Class members could not reasonably expect Defendant would commit acts in violation of federal and state civil and criminal laws.

156. Defendant's actions constituted a serious invasion of privacy in that it:

iv. Invaded a zone of privacy protected by the Fourth Amendment, namely the right to privacy in data contained on personal computing devices, including browsing histories

v. Violated federal and state laws on eavesdropping and invasion of privacy, including the California Invasion of Privacy Act and the Guest Records Statute;

vi. Invaded the privacy rights of thousands and thousands of Americans (including Plaintiff and Class members) without their consent;

vii. Constituted the unauthorized taking of valuable information from millions of Americans through deceit; and

viii. Further violated Plaintiff's and Class members' reasonable expectation of privacy via Defendant's review, analysis, and subsequent uses of Plaintiff's and Class members' private browsing activity that Plaintiff and Class members considered sensitive and confidential.

157. Committing the above privacy violations against thousands and thousands of Americans constitutes an egregious breach of social norms that is highly offensive.

158. The surreptitious and unauthorized tracking of the confidential guest records of thousands and thousand of Americans, particularly where, as here, California state law specifically protects guest records from disclosure, constitutes an egregious breach of social norms that is highly offensive.

159. Defendant's intentional intrusion into Plaintiff's and Class members' computing devices and web-browsers was highly offensive to a reasonable person in that Defendant violated state criminal and civil laws designed to protect individual privacy and against theft.

160. The taking of personally-identifiable information from thousands and thousands of Americans through deceit is highly offensive behavior.

161. Secret monitoring of private guest records is highly offensive behavior.

162. Eavesdropping on confidential communications with hotels is highly offensive behavior.

163. Following Defendant's unauthorized collection of the sensitive and valuable personal information, the subsequent analysis and use of the private guest records to target Plaintiff, Class members, and consumers with advertising violated their reasonable expectations of privacy.

164. Defendant lacked a legitimate business interest in analyzing users' data and tracking users while guests were booking their hotels to target them with advertising without their consent.

165. Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief and judgment against Defendant as follows:

A. For an order certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23;

B. For an order appointing Plaintiff and her counsel to represent the Class;

C. For an order declaring that Defendant's conduct violates the statute referenced herein;

D. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

E. For an order enjoining Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with it, from the misconduct described herein;

F. For an award of statutory, actual, compensatory, and/or nominal damages as permitted by applicable law;

G. For restitution to the extent permitted by applicable law;

H. For pre-judgment and post-judgment interest;

I. For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

J. For such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the Class, demands a trial by jury on all issues so triable.

Dated this 5th day of June, 2025.

DWOSKIN WASDIN LLP

*/s/ Eric S. Dwoskin*

Eric S. Dwoskin (admitted *pro hac vice*)
433 Plaza Real, Ste. 275
Boca Raton, FL 33432
Phone: (561) 849-8060
edwoskin@dwowas.com

Robert G. Loewy (SBN 179868)
rloewy@rloewy.com
LAW OFFICES OF ROBERT G. LOEWY, P.C.
20 Enterprise, Suite 310
Aliso Viejo, CA 92656
Tel: (949) 468-7150

*Attorneys for Plaintiff and the Putative Class*

**E-FILING ATTESTATION**

I, Eric S. Dwoskin, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Eric S. Dwoskin*
Eric S. Dwoskin