Eric S. Dwoskin (*pro hac vice*)
edwoskin@dwowas.com
**DWOSKIN WASDIN LLP**
433 Plaza Real, Ste. 275
Boca Raton, Florida 33432
Tel.: 561-849-8060

Robert G. Loewy (SBN 179868)
rloewy@rloewy.com
**LAW OFFICES OF ROBERT G. LOEWY, P.C.**
20 Enterprise, Suite 310
Aliso Viejo, CA 92656
Tel: (949) 468-7150

Attorneys for Plaintiff
and the Proposed Classes

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUELLEN CRANO, individually and on behalf of other similarly situated individuals,<br><br>Plaintiff,<br><br>vs.<br><br>SOJERN, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 3:25-CV-2600-JSC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR**<br><br>**(1) CALIFORNIA INVASION OF PRIVACY ACT (Cal Penal Code § 631(a));**<br>**(2) CALIFORNIA INVASION OF PRIVACY ACT (Cal Penal Code § 632);**<br>**(3) UNFAIR COMPETITION LAW (Cal. Bus & Prof. Code §§ 17200, *et seq*.)**<br>**(4) UNJUST ENRICHMENT;**<br>**(5) ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. § 2511(1), *et seq*.)**<br>**(6) INVASION OF PRIVACY**<br>**(7) INTRUSION UPON SECLUSION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Suellen Crano, individually and on behalf of all others similarly situated (the "Class Members"), brings this second amended class action complaint against Sojern, Inc. ("Defendant" or "Sojern"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, including based on the investigation of counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have booked a hotel room in a hotel that is part of an illicit web tracking marketing enterprise run by Sojern.

2. Sojern's web tracking enterprise illicitly tracks hotel guests across the internet without consent to send the guests' direct solicitations to drive conversions for hotels in its network.

3. To do so, Sojern causes a tracker to be placed on guests' computers, eavesdrops on communications sent and received by Plaintiff and Class Members to hotels, including communications that contain sensitive and confidential booking information, and records that information for its own use and use by the hotels in the network. By intercepting these communications, Sojern violated the California Invasion of Privacy Act ("CIPA") §§ 631, 632 and other California and federal laws.

## THE PARTIES

4. Plaintiff Suellen Crano is a resident and citizen of Upland, California. During the relevant period of time, Plaintiff booked Hilton and Marriott hotel rooms online on Hilton.com (the "Hilton Website") and Marriott.com (the "Marriott Website"), respectively. While in California and using her computer located in California, Plaintiff: (a) accessed the Hilton Website, including on or around April 4, 2024, and searched for and booked hotel rooms at Hilton properties, including hotel rooms at Hilton properties located in California; and (b) accessed the Marriott Website, including on or around August 2, 2023, and searched for and booked hotel

rooms at Marriott properties, including hotel rooms at Marriott properties located in California. Plaintiff accessed the Hilton Website and Marriott Website using the Chrome web browser on her computer located in California. Unbeknownst to Plaintiff, Defendant Sojern offers hotels, like Hilton and Marriott, an online tracking technology that, when placed on a hotel's website, causes tracking software to be installed on the consumer's computer that intercepts the consumer's communications with the hotel and discloses those communications to Sojern, and Hilton and Marriott had each installed Sojern's tracking technology on their websites. Through the systematic process described in more detail below, Sojern intercepted Plaintiff Crano's communications with the Hilton and Marriott Websites—including communications that contained Plaintiff Crano's confidential booking information—as they were being sent by Plaintiff Crano from her computer in California. The communications intercepted by Sojern included unique identifying numbers associated with Plaintiff Crano alongside information that identified the relevant hotel ID, hotel name/location, hotel room price, number of rooms, check in date, check out date, and the fact that Plaintiff Crano completed her reservations. Plaintiff Crano did not consent to these interceptions. As a result of booking Hilton hotel rooms in the past, Plaintiff Crano presently has "Hilton Honors" points that can be exchanged toward the cost of future Hilton hotel room reservations. Plaintiff Crano anticipates using those points in the future by booking additional hotel rooms on the Hilton Website, but cannot presently do so without Defendant unlawfully intercepting her communications with Hilton. As a result of booking Marriott hotel rooms in the past, Plaintiff Crano presently has "Marriott Bonvoy" points that can be exchanged toward the cost of future Marriott hotel room reservations. Plaintiff Crano anticipates using those points in the future by booking additional hotel rooms on the Marriott Website, but cannot presently do so without Defendant unlawfully intercepting her communications with Marriott.

5. Defendant Sojern, Inc. is a Delaware corporation with its principal place of business located at 545 Market Street, Floor 4, San Francisco, CA 94105.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

7. The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. Plaintiff accessed and navigated the Website while in California, where her communications were intercepted by Defendant in this District.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I. The California Invasion of Privacy Act

9. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

10. As the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a

> conversation and ***its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device***.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

11. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [ii] "willfully and without the consent of all parties to the communication, or in any unauthorized manner, read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

12. Cal. Penal Code § 632 also provides, in pertinent part, that it is unlawful for any person "intentionally and without the consent of all parties to a confidential communication," to "use[] [a] recording device to … record the confidential communication."

13. Individuals may bring an action against the violator of CIPA §§ 631, 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## II. Sojern Eavesdrops on Californians' Communications in Violation of CIPA

### A. *Background on Web Browsers, Source Code, & Sojern Tracking Pixel.*

14. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

15. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

16. Internet users use web browsers to send, receive, and view electronic communications on the Internet.

17. The communications between a user and the website host begin when the user arrives at the intended website. The communications continue as the user navigates the website. The communications end when the user closes their browser or goes to an unrelated website. Communications restart if a user returns to the website.

18. When an individual uses a web browser to navigate to a website, a number of communications occur between the user's computer and the server that hosts the website. The messages between the user's computer and the server that hosts the website include the following contents:

a. *A "GET request" sent from the user's computer to the website server, and a responsive "POST" request sent from the website server to the user's computer.* When an individual internet user visits a web page, his or her web browser sends a message called a "GET request" to the webpage's server. The GET request tells the website what information is being requested and then instructs the website to send the information back to the web browser on the user's computer, which the website does via a responsive "POST request" sent to the users' web browser. The GET and POST requests include the content the user requested the website to display.

b. *The URL*. The uniform resource locator, or URL, is the location of the requested content on the web server. The URL of a webpage is typically shown in the address bar of the user's browser. URLs often

use plain language to describe the associated content (*e.g.*, www.website.com/descriptionofcontentonpage).

c. *The IP address of the user's connection to the internet.* IP stands for "Internet Protocol." When connected to the Internet, each device is assigned a unique IP address by the Internet Service Provider ("ISP") that is providing the internet connection. IP addresses may change over time but often do not. In many cases, an ISP will continue to assign the same IP address to the same device.

d. *Information on the User Agent*. A user agent is the hardware and/or software responsible for retrieving the requested content, such as the device, operating system and web browser.

e. *A Timestamp*. A timestamp is the time of a request or event that a computer records. The timestamp displays when certain information was requested or exchanged.

19. In addition to exchanging the above communications with users' computers, websites can also cause tracking technologies (often referred to as "cookies" or "tracking pixels" or "beacons") to be installed on the accessing users' computer. These technologies include small files that the website places on the user's web browser to collect data about the user's online activity. These technologies work by assigning or associating the user with a unique identifier, storing that identifier with other information about the user (*e.g.*, geographic location, device specifications, etc), gathering data on the user's activity on the website in real time, and transmitting that data to the host website and the third-party technology vendor. Two of the primary reasons website operators use these technologies is to (a) track user's activity on the website; and (b) enable the website host to subsequently serve the website user with targeted advertising across the internet.

20. Tracking technologies effectively open a spying window through which the tracking technologies funnel data about users and their actions with the host website to third parties in real time from the user's browser. It is akin to placing a bug at the point of origin of a call, which causes the communication with the intended recipient, in this case, the hotels, to be simultaneously, contemporaneously, live, and in real time transmitted to the tracking technology provider (in this case, Sojern).

21. When a user accesses a website hosting a tracking technology, the tracking technology is surreptitiously downloaded and installed on the user's computer and thereafter transmits the users' communications with the website to the third-party technology provider (in this case, to Sojern in California).

22. This secret transmission to the third-party technology provider contains the communications exchanged between the website user and the host website (*e.g.*, the "GET request" and a "POST request"), along with additional data that the tracking technology is configured to collect (*e.g.*, unique identifiers that allow the technology providers to associate the collected data with the individual website user).

23. The communications transmitted to the third-party technology vendor include those contents described in Paragraph 18, including the GET and POST requests, the webpage's Universal Resource Locator ("URL") and metadata, and user IP address.

24. Hence, the tracking technology reads the entire contents of the communication with the hotels in real time and is configured to collect specific aspects of the communication with the host website that is relevant to Sojern's business purposes. The relevant parts of the communication are then transmitted from the user's browser to Sojern's servers, where it is then further processed and analyzed and used, in this case, for targeted advertising.

25. This transmission is initiated by a tracking tool's code that lives on the user's browser and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read the host website—the website host's own code (which communicates with the user's web browser to deliver the requested web content), and a tracking tool's code (which captures those communications and combines them with other information about and identifying the user). Thus, the tracking tool intercepts the communications on the website user's computer, in real time, while the user is actively communicating with the website.

26. Once the third-party technology vendor collects the information contained in the website user's communications with the host website, the third-party can store and use the information for various purposes of their own, including pecuniary purposes and facilitating targeted advertising.

27. To be clear, the tracking technology starts collecting the communications at the point of origin (i.e., the guest's computer) at the same time as that communication is being transmitted to the website host (i.e., the hotel).[1] And once it arrives at Sojern's servers it is recorded and stored for later use by Sojern.

[1] The Court's order dismissing the First Amended Complaint without prejudice noted that Plaintiff alleged the communications were "re-directed" to Sojern, as opposed to intercepted in real time. It appears that the Court read that allegations to mean that the hotel/website re-directed the communication to Sojern *after* it arrived at the hotel's servers. That was not how Plaintiff intended to use the word "re-direct." When Plaintiff used the word "re-direct" in the prior complaint, she meant that, after intercepting the communication in the manner described herein, the Sojern Tracking Pixel forwards the communication from the user's computer to Sojern, without authorization. Thus, Plaintiff intended to use the term "re-direct" similarly to the Ninth Circuit's description of tracking technology in *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule."). Plaintiff's amendment is intended to eliminate ambiguity to more accurately describe the technical process of interception, including that it occurs in real time, at the point of the communication's origin on the user's web browser.

28. On a technical level, that is how Sojern's technology deploys to intercept Plaintiff and the Class's communications with the hotels in Sojern's marketing enterprise.

**B. An Overview of Sojern's Marketing Enterprise**

29. Sojern allows hotels to identify and advertise to in-market travelers for purposes of online behavioral advertising and to optimize advertising campaigns across multiple channels and devices.

30. To do so, Sojern tracks travelers across devices and browsers using a technology referred to herein as the Sojern Tracking Pixel.

31. Sojern offers the Sojern Tracking Pixel so that hotels will install it on their websites and other online properties.

32. Once installed on a hotel's online property, the Sojern Tracking Pixel automatically collects personal information from guests' computers when the guest is visiting hotel's websites and transmits that information to Sojern from the guests' computers. Once it arrives at Sojern's servers, the communications containing the booking information are recorded, stored, and processed for Sojern's business purposes.

33. The personal information collected by the Sojern Tracking Pixel from hotel website user's computers includes the user's communications with the hotel website and a cookie ID, mobile advertising ID (MAID), TV identifier, email address, and other persistent alpha-numerical unique identifiers, which are shared alongside other information, such as IP address, device type, browser type, date and time stamp of clicks and web visits, detailed referrer URLs, and other technical information. Like an address or social security number, the user-specific values transmitted to Sojern through the Sojern Tracking Pixel are unique numerical identifiers that can be used to identity the individual website users in the real world and track them across multiple websites. Additionally, when Sojern provides direct

email marketing services, the hotel causes the users' browsers to disclose users' email addresses that Sojern collects in plain text.

34. Sojern uses this information to create custom audiences for hotel advertising campaigns.

35. Sojern also uses the information collected for its own internal business purpose, including research and product development and improvement and analysis that it uses to, among other things, enhance the Sojern Tracking Pixel's ability to convert sales for hotels within its entire marketing enterprise, to sell more of its services to other existing and potential customers and to beat competitors and to sell their products for more profit.

36. Sojern is, in essence, a data business. It sources data directly from users' communications with hotels and other travel businesses (*e.g.*, airlines, travel and leisure companies, etc) and uses that data to create rich, deep profiles on individual travelers, including to identify those individuals' intended purchases and where they will be and when. It then uses that data to sell Sojern's marketing services to other travel companies that want to market products to the same highly specific audiences. So, for example, the communications Sojern intercepts related to hotel booking will tell Sojern where an individual traveler is heading and when, and Sojern then uses that information for other marketing clients who wish to sell that consumer other products at that specific location.

37. As Sojern's Senior Commercial Director described it in an interview: "Sojern's a leading travel data marketing company where we combine real intent data with booking confirmation data **in real time** to run very targeted marketing campaigns for other companies that we work with across the travel and leisure industries. So that could be suppliers, that could be airlines, hotel chains, etc, or it could be leisure companies that are interested in promoting their products and services to a travel and leisure audience. … Data is changing the travel industry in the sense that its giving greater insights around what consumers want, looking at the

demands that consumers are placing on suppliers, and then allowing us to react to that demand to shape the messaging and products that are delivered to consumers … to influence that person's decision. And data really allows the insights to make those informed decisions rather than simply making assumptions as to who your audience is or what they may or may not like. We're looking at intent to make a certain purchase, or intent to go to a specific destination, or a confirmed booking confirmation," which "may subsequently lead to an additional purchasing decision. All of that is based around having the insight that the data provides. … Our data is used to power … advertising campaigns for our clients"

38. More recently, Sojern is expanding its data business into the area of marketing "curation." Curation refers to the practice of pre-selecting high-quality travel products and combining it with marketing audience data, like Sojern's, to create more targeted and efficient media buys for Sojern's clients. Curation involves the use of real-time signals – such as flight searches, hotel availability, booking windows, and destination trends – to create granular audience segments that reflect actual traveler intent. These curated segments can then be activated across high-performing ad formats, including display, native, video, and social, to ensure messages appear where they're most likely to influence decision-making.

39. As a Sojern Global VP described it in an interview: "We've scaled a pretty big travel curation business," and Sojern's goal is "to own curation for the travel sector." "We own a huge travel data set that is really specific, really unique and differentiated to our vertical. We also have a lot of technology that allows us to optimize in real time to the campaign objectives that airlines and hotel chains and cruise companies want." "The ability to crunch huge amounts of data," and "see patterns," allows Sojern to make profiles of individual travelers "based on the actual intent to do a thing, not just some of the behaviors that we've gleaned."

40. Sojern's curation business also involves combining its internal data on individual travelers with the data sets held by its marketing partners (*e.g.*, hotels and

airlines). As a Sojern Global VP described it in several interviews: "There is so much data enrichment opportunities between our data set and advertisers data sets to really understand all of the things that go into travel." Thus, Sojern has "data partnerships all over the world, from online travel agencies, airlines, hotel chains, to really build a deep understanding … of what travelers do through their path to purchase, their actual buying habits, and their post-buying, what happens between the purchase and the arrival." This effort to focus individual-specific insights from multiple data sets is not without complications, because, when combining the data, Sojern has to ensure that "all of the [unique] identifiers are linked" so that data individual-specific data in one company's possession can be combined with data in Sojern's possession regarding that same individual.

41. Sojern tracks travelers at every stage of the booking process (including through reservation) to profile, find and target guests with marketing related to their interests and intended travel. Sojern does this for its own financial benefit, as it sells the insights it gleans from the communications it captures to other advertisers in the travel industry.

42. In other words, Sojern operates a "data lake" where it collects as much information relating to a hotel guest as possible all from different sources (including offline booking data (*e.g.*, call center, walk-in, travel agent bookings), stores that information in a centralized location (including, in its servers in California) where it matches data points and creates detailed profiles on individuals, and then uses those profiles to send direct, targeted advertisements from marketers in the travel industry, even when the user did not authorize it.

### C. Sojern Eavesdrops on Californians' Communications with Hotels, including Hilton and Marriott

43. To illustrate how the Sojern illicit marketing enterprise works, take the example of Hilton and Marriott hotels.

44. Hilton owns and operates the Hilton Website. Hilton has integrated the Sojern Tracking Pixel into Hilton's Website.

45. Marriott owns and operates the Marriott Website. Marriott has integrated the Sojern Tracking Pixel in Marriott's Website.

46. On the Hilton and Marriott Websites, website users can, among other things, browse and book hotel rooms at Hilton and Marriott properties throughout California.

47. When doing so, website users communicate confidential information to Hilton and Marriott, including their names, the properties and hotel rooms requested and booked, and the dates of their stay. This booking information is confidential because it identifies private aspects of the consumer's life (where they will be, with or without their family, and when), and a reasonable consumer would not expect that the information would be eavesdropped upon or otherwise shared with third parties. Indeed, the information is so sensitive that it is unlawful for the hotels to share it with a third party under California law. Cal. Civil Code § 53.5.

48. Hilton and Marriott Website users' communications with those hotels are the product of website users affirmatively entering, and interacting with, information on the hotel websites (*i.e.*, the communications are not automatically generated). As set out below, the communications stem from website users conveying responses to questions and prompts, and actively making other inputs and selections. All of the foregoing is information created by and in response to website users' communicative inputs; information created by and in response to website users' intended messages to Hilton and Marriott regarding, among other things, the properties and hotel rooms being searched for and booked; and information created by and in response to website users' having conveyed and expressed their respective desires that the websites would supply them with certain, highly personalized, types of information and/or responses.

49. Hilton and Marriott Website users may browse and book hotel rooms on the Hilton and Marriott Websites. To do so, they select the hotel at which they would like to book, the desired dates for their trip, and the price they are willing to pay.

50. Unbeknownst to Plaintiff and Class Members, however, Sojern has caused to be placed the Sojern Tracking Pixel on their browsers and is eavesdropping on those confidential communications with Hilton and Marriott.

51. Sojern contemporaneously intercepts website users' communications with the Hilton and Marriott Websites regarding the hotel at which they would like to book, the desired dates for their trip, and the price they are willing to pay, whether they confirmed the reservation, etc.

52. Via the Sojern Tracking Pixel, Sojern collects, alongside unique identifying numbers identifying the individual consumer, at least the following information from hotel guests booking Hilton and Marriott hotel rooms through the Hilton and Marriott Websites:

a. Hotel ID;
b. Hotel name/location;
c. Hotel room price;
d. Number of rooms;
e. Check in date;
f. Check out date; and
g. The fact a reservation was completed.

53. The Sojern Tracking Pixel is configured to read the entire communication between the guest and the hotel but only to collect these particular aspects of the communication between the guest and Marriott and Hilton from their point of origin on the guest's web browser in real time while the guest is communicating with Marriott and Hilton.

54. Via the Sojern Tracking Pixel, Sojern eavesdrops on and intercepts these communications at their point of origin on the guest's web browser, which information is then transmitted to Sojern's servers, contemporaneously as the guest is communicating with Hilton and Marriott. From the point at which the Sojern Tracking Pixel collects the communications with Hilton and Marriott on the guest's browser, Sojern is reading, or attempting to read, or to learn the contents or meaning of the guest's communications with Hilton and Marriott. Hence Sojern is reading, or attempting to read, or to learn the contents or meaning of the guest's communications with Hilton and Marriott while the communication is being transmitted from the guest's browser to Hilton and Marriott's servers or passing over internet from the guest's browser to Hilton and Marriott's servers or while the communication is being sent from the guest's browser within California to Hilton and Marriott's servers. From the point at which the Sojern Tracking Pixel collects the communications with Hilton and Marriott on the guest's browser, Sojern is secretly monitoring the guest's communications with Hilton and Marriott. Sojern is an unannounced second auditor of the guest's communications with Hilton and Marriott, even if that auditor is a device (*i.e.* the Sojern Tracking Pixel).

55. Although the above example relates to a booking on Hilton's and Marriott's Website, the Sojern Tracking Pixel operates on many other travel websites operated by hotel chains and other travel companies that participate in Sojern's marketing enterprise, including, among others, Best Western and Fairmont. Sojern eavesdrops on guest's communications with other travel companies in its marketing enterprise in a substantially similar manner, and obtains the same types of information related to individual's communications with those companies.

56. Sojern pairs the event data with a user's identity using various unique IDs, including IDs referred to as a cid, apnid, ttdid, adfid, ccid, uid2.0, and, when supplied by the travel company, an email address.

57. Sojern refers to these and other IDs as targetable identifiers that work by providing a way to recognize and differentiate individual users online that are designed to evade third-party cookie blockers.

58. Sojern cookie syncs with other companies, such as Facebook, Google, and YouTube to show guests ads.

59. Sojern uses these cookies to pair event data with personally identifiable information so it can later retarget consumers. (Think of browsing a hotel room and then later seeing advertising for that hotel room, or other travel services in that destination, on Facebook.)

60. By enabling and otherwise causing the Sojern Tracking Pixel to be placed on guest's browsers while they are communicating with hotel's in the Sojern marketing enterprise, which discloses booking information, alongside the unique individual identifiers described above, Sojern willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within California and uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

## III. Plaintiff and Class Members Had a Reasonable Expectation of Privacy in their Communications with Hotels

61. Hotel booking details are inherently private and sensitive, as they disclose where individuals will be (with or without their family) and when. Conversely, they also disclose where the individual will *not* be, as if the individual is booked to be in a different city or state on a particular day they will, by definition, not be at home. Consumers have a reasonable expectation of privacy in this information, and a reasonable expectation that a third-party is not eavesdropping on their communications with hotels exchanging this information.

62. Indeed, the information is so particularly sensitive that, in 2018, the California legislature passed California S.B. 1194 (September 27, 2018) to protect the information Californians disclose to hotels, including "where they stay on their trip[s]." The California legislature recognized that "[w]hen Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure," and that "[p]rotecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses." *Id*. "Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed."

63. As such, pursuant to California Civil Code § 53.5(a), hotel operators (and agents thereof) who offer or accept payment for hotel rooms "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, ***all or any part of a guest record*** orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order." Cal. Civil Code § 53.5(a) (emphasis added).

64. Per Cal. Civil Code § 53.5(c), the term "guest record" includes "any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or ***other unique identifying number***, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number."

65. The information that the Sojern Tracking Pixel collects are guest records within the meaning of Cal. Civil Code § 53.5(c). The information includes records that identify an individual guest, boarder, occupant, lodger, customer, or

invitee, including with unique identifying number. The records also contain other parts of the guest records, including the relevant booking information.

66. Sojern has admitted that booking information are guest records and that hotels in the Sojern marketing enterprise "provide" "[b]ooking information" or "guest records" to Sojern so "Sojern can record 'conversions' that show whether the [hotel's] advertising is effective." ECF 33 at 7-8 n.4.

67. Because the booking information are "guest records," the hotels in the Sojern marketing enterprise, such as Marriott and Hilton, were forbidden from disclosing them absent a court-issued subpoena, warrant, or order. None of the hotels in Sojern's marketing enterprise had such a court-issued subpoena, warrant, or order to disclose Plaintiff and the Class's guest records.

68. Additionally, consumers reasonable expectation of privacy in this information is further bolstered by the fact that Marriott and Hilton both disclaim that they share booking details (sometimes called room preferences or stay preferences), with third-parties, like Sojern, for marketing purposes.

69. Because booking information is inherently private and sensitive, and because it is specifically protected under California law, and because Marriott and Hilton both promise they will not share booking information with third parties like Sojern, Plaintiff's and Class Member's expectation that their booking information would not be shared with third parties is objectively reasonable.

70. By recording and storing guests' communications with hotel's in the Sojern marketing enterprise via the Sojern Tracking Pixel, alongside the unique individual identifiers described above, Sojern, intentionally and without the consent of the guests that are communicating confidentially with the hotels in Sojern's marketing enterprise, uses a recording device to record the guests confidential communication with the hotels in Sojern's marketing enterprise.

## IV. The Value of the Data Taken from Plaintiff

71. Sojern profits from its use of Plaintiff's and Class member's personal data to target them with advertising and for other economic benefits.

72. As described above, Sojern uses the data to sell insights to travel companies that can be used to target those companies' marketing messages. This monetization of consumers' data is highly profitable to Sojern, and has allowed Sojern to scale a large travel marketing business.

73. Moreover, the value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech industry. A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge." That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

74. The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this complaint, including as early as 2013, with its publication "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[2] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[3]

---

[2] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[3] https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

75. In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[4] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

76. Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[5]

77. Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is

---

[4] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).
[5] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

> analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[6]

78. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[7]

79. The cash value of the personal user information unlawfully collected by Sojern provided during the Class Period can be quantified. For example, a group of researchers studied the value that internet users place on their online browsing history and concluded that users value items of their online browsing history at $10.[8]

80. Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information.

---

[6] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

[7] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

[8] Juan Pablo Carrascal, et al., *Your browsing behavior for a big mac: economics of personal information online*, Proceedings of the 22nd International Conference on the World Wide Web, available at https://dl.acm.org/doi/abs/10.1145/2488388.2488406.

Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

81. User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

82. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

83. A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

a. Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[9]

b. Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[10]

c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[11]

d. Killi is a new data exchange platform that allows you to own and earn from your data.[12]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[13]

---

[9] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[10] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[11] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[12] https://killi.io/earn/.

[13] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[14]

84. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[15]

85. The California Consumer Privacy Act (CCPA) recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a]

---

transparent, with consumers made fully aware of how their data is used and who has access to it.").

[14] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[15] Kari Paul, *Google launches app that will pay users for their dat*a, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacystudy; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-datatechcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-prounanciations-app.

business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

**V. Sojern Was Unjustly Enriched by Taking Plaintiff's and Class Member's Data and Communications Without Consent and Without Compensation and Plaintiff and Class Members Were Damaged by that Conduct**

86. The sole purpose of the use of the Sojern Tracking Pixel is marketing and profits.

87. Through its unlawful data collection, Sojern is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how they would monetize their own data.

88. Through its unlawful data collection, Sojern is unjustly enriching itself based on the value of Sojern's unauthorized access to Plaintiff's and Class members' data and communications resulting from Sojern's wrongful conduct. This value is analogous to the value for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of value is appropriate here under common law principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class members have a protectible property interest in their data and communications; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

89. Sojern uses customers' booking information to generate revenue. This revenue can come by way of using the data it collects to deliver its own services more effectively, selling the data it collects to third parties so that they can direct targeted advertisements to customers, or sharing the data it collects to companies that intend to direct advertisements to customers on websites with Sojern's marketing enterprise thereby generating additional advertising revenue for Sojern. The fact that Sojern generates this revenue is verification that customer's booking information are financially valuable within the online environment where they are exchanged. The value generated by customers' booking information, while small to the customers, is substantial to Sojern. Nevertheless, Sojern does nothing to compensate consumers for the use of their booking information. Nor does Sojern obtain the consent of its customers to sell or share this data. This conduct dilutes the value of its guests' data and deprives guests of their value.

90. Plaintiff and Class Members were damaged by Sojern's conduct because Sojern took something of value to them (i.e., their communications and data with the hotels in the Sojern marketing enterprise) without their consent or providing compensation.

## VI. Delayed Discovery & Tolling

91. Each unauthorized collection of private, personal data by Sojern is a separate "wrong" which triggers anew the relevant statute of limitations.

92. Further, all applicable statutes of limitation have been tolled by operation of the delayed discovery doctrine, which delays accrual until Plaintiff have, or should have, inquiry notice of the cause of action. Plaintiff and Class members were not on inquiry notice despite acting with reasonable diligence. Plaintiff do not have the expertise in identifying and interpreting the underlying coding and the operation of the Sojern Tracking Pixel in order to discover Sojern's wrongful conduct.

93. Plaintiff did not discover and could not reasonably have discovered that Sojern was collecting, storing, and using their personal, private data in the ways set forth in this Complaint until she consulted with counsel—shortly before the Complaint was filed.

94. Upon learning about counsel's investigation into Sojern's improper collection, storing, and use of their personal, private data, Plaintiff diligently sought to uncover the facts, including by consulting with, and hiring, knowledgeable counsel to bring this case.

## CLASS ACTION ALLEGATIONS

95. Plaintiff seeks certification of the following classes.

All residents of the United States who had their personal information collected by Sojern while booking an inn, hotel, motel, or lodginghouse (the "Nationwide Class").

All California residents who had their personal information collected by Sojern while booking an inn, hotel, motel, or lodginghouse (the "California Subclass").

96. Plaintiff reserves the right to modify the definition of the Classes, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

97. The proposed Classes exclude any officers and directors of Defendant; Class Counsel; and the judicial officers presiding over this action and the members of their immediate family and judicial staff.

98. **Numerosity, Fed R. Civ. P. 23(a)(1)**: The Classes are composed of at least thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

99. **Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**: There is a well-defined community of interest in the questions of law and fact

involved affecting the members of the proposed Classes. The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant violated CIPA §§ 631(a) or 632; and
b. Whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

100. **Typicality, Fed. R. Civ. P. 23(a)(3)**: The claims of the named Plaintiff are typical of the claims of the Classes because Plaintiff, like all other class members, had her confidential electronic communications intercepted and disclosed to Sojern.

101. **Adequacy, Fed. R. Civ. P. 23(a)(4)**: Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

102. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**: The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Classes. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy

of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Numerous consumers were cheated out of small sums of money through deliberate behavior of Defendant that they could not practically recover in individual suits. Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

103. **Policies Generally Applicable to the Class**. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

104. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions

would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

105. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

106. **Ascertainability & Notice**. Membership in the Classes can be determined by objective records maintained by Defendant and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

107. **Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**. Unless a Class-wide injunction is issued, Defendant will continue to intercept booking information and other sensitive communications of Class Members, and otherwise Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## CAUSES OF ACTION

### Count I

### Violation of the California Invasion of Privacy Act

### Cal. Penal Code § 631(a)

108. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

109. Plaintiff brings this claim against Defendant individually and on behalf of the Classes.

110. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> . . .
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained
>
> . . .

111. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

112. The Sojern Tracking Pixel is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

113. Sojern is not a party to website user's communications with hotel websites. The guests booking hotels at hotels within Sojern's marketing enterprise were intending to communicate with the hotels, not Sojern. Sojern is an independent entity that provides tracking technology that intercepts communications with hotel guests, which Sojern uses for marketing purposes, including marketing on behalf of other travel providers, for Sojern's profit. Sojern's technology does not merely

passively record the communications for the hotel's benefit. Rather, Sojern has the capability to use the information it collects via the Sojern Tracking Pixel for its own purposes, and, in fact, does use that information for its own purposes, including as described above. Accordingly, Sojern is a third party to any communication between Plaintiff and Class Members, on the one hand, and the hotels that participate in the Sojern marketing enterprise, on the other.

114. At all relevant times, by its Sojern Tracking Pixel, Sojern willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and the hotels that participate in the Sojern marketing enterprise, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

115. At all relevant times, Sojern used or attempted to use the communications intercepted by its Sojern Tracking Pixel to promote and improve its advertising platform and to otherwise benefit itself through the analysis of data and other information from hotels within the Sojern marketing enterprise.

116. Plaintiff and Class Members did not provide their prior consent to Sojern's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.

117. Sojern's eavesdropping on Plaintiff and Class Members' communications occurred in California, where Plaintiff and Class Members accessed the hotels within the Sojern marketing enterprise and where Sojern is headquartered and collects Plaintiff's and Class Members' electronic communications.

118. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory

damages of $5,000 for each of Defendant's violations of CIPA § 631(a) and injunctive relief to stop the violations alleged herein.

**<u>Count II</u>**

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code § 632**

119. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

120. Plaintiff brings this claim against Defendant individually and on behalf of the Classes.

121. CIPA is codified at Cal. Penal Code §§ 630-638. The Act begins with the following statement of purpose:

> The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

122. Cal. Penal Code § 632 provides, in pertinent part, that it is unlawful for any person "intentionally and without the consent of all parties to a confidential communication," to "use[] [a] recording device to … record the confidential communication."

123. As used in the statute, a "confidential communication" is:

> any communication carried on in circumstances as may reasonably indicate that any party to the communication desired it to be confined to the parties thereto[.]

124. The Sojern Tracking Pixel and/or Sojern's servers constitute a "recording device" within the meaning of CIPA § 632(a). The Sojern Tracking Pixel, and/or Sojern's servers that receive and store the data collected by the Sojern Tracking Pixel, record a guest's communications with the hotels in the Sojern marketing enterprise at the time it reaches Sojern's servers.

125. In the alternative, Sojern records a user's communications with guests communicating with hotels in the Sojern marketing enterprise in real-time as the user navigates the hotel's websites, including capturing any information that the user may input or select and recording the links that the user clicked, from the guest's browser.

126. The internet constitutes a "device" within the meaning of CIPA § 632(a)

127. Defendant is a "person" within the meaning of CIPA § 632.

128. Defendant intentionally and without the consent of Plaintiff and Class Members used the Sojern Tracking Pixel, and/or Sojern's servers that receive and store the data collected by the Sojern Tracking Pixel, to record the confidential communication between hotels in the Sojern marketing enterprise and Plaintiff and Class Members, including regarding their booking information.

129. Sojern is not a party to website user's communications with hotel websites. The guests booking hotels at hotels within Sojern's marketing enterprise were intending to communicate with the hotels, not Sojern. Sojern is an independent entity that provides tracking technology that intercepts communications with hotel guests, which Sojern uses for marketing purposes, including marketing on behalf of other travel providers, for Sojern's profit. Sojern's technology does not merely passively record the communications for the hotel's benefit. Rather, Sojern has the capability to use the information it collects via the Sojern Tracking Pixel for its own purposes, and, in fact, does use that information for its own purposes, including as described above. Accordingly, Sojern is a third party to any communication between

Plaintiff and Class Members, on the one hand, and the hotels that participate in the Sojern marketing enterprise, on the other.

130. Plaintiff's and Class Members' communications with the hotels in Sojern's marketing enterprise were confidential communications within the meaning of CIPA. Plaintiff and Class Members had objectively reasonable expectations of privacy in their communications with the hotels in Sojern's marketing enterprise for three separate and independent reasons: (a) they are inherently private and sensitive for the reasons described above; (b) they include "guest records" within the meaning of Cal. Civil Code § 53.5; and (c) hotels in the network, such as Marriott and Hilton, specifically disclaimed sharing booking information for marketing purposes. Moreover, Sojern did not obtain Plaintiff's or the Class's advance consent to the recording or monitoring of their communications with the hotels in its network. As a result, Plaintiff and the Class had an objectively reasonable expectation that their communications were not being recorded and/or eavesdropped upon by Sojern.

131. Unless enjoined, Defendant will continue to commit the violations of law alleged here. Plaintiff wants to continue to communicate with the hotels in Sojern's marketing enterprise but has no practical way of knowing if her communications, including "guest records," are being intercepted by Sojern and thus continue to be at risk of harm from Defendant's conduct.

132. Plaintiff and Class members seek to recover the value of the unauthorized access to their data and communications resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's

use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class members have a protectible property interest in their data and communications; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

133. Defendant's actions caused damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their personal information.

134. Plaintiff and Class Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation or three times the actual amount of damages.

## <u>Count III</u>

## Unfair Competition Law ("UCL")

## Bus. & Prof. Code §§ 17200, *et seq*.

135. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

136. Plaintiff brings this claim against Defendant individually and on behalf of the Classes.

137. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (UCL). By engaging in the practices aforementioned, Defendant has violated the UCL.

138. Defendant's "unlawful" acts and practices include its violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632; the Electronic

Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1) *et seq*.; intrusion upon seclusion and invasion of privacy; and Cal. Civil Code § 53.5.

139. As to Cal. Civil Code § 53.5, Sojern provided substantial assistance to the hotels in its marketing enterprise for their violations of Cal. Civil Code § 53.5 because the hotels in its marketing network embedded the Sojern Tracking Pixel into their websites. Sojern knowingly programmed the Sojern Tracking Pixel to be used by hotels in its marketing network to collect booking information for advertising purposes and to increase its profits. Sojern knew that such tracking technology would transmit site visitors' activity, including their booking information, as the entire purpose of implementing such technology is so that Sojern can target advertisements on behalf of the hotels in the network. Sojern knew or should know that such disclosures violate Cal. Civil Code § 53.5.

140. Defendant's conduct violated the spirit and letter of these laws, which protect privacy interests and prohibit unauthorized collection of private, personal data and communications.

141. Defendant's "unfair" acts and practices include its violation of privacy interests protected by the statutes identified above in Paragraph 139. To establish liability under the unfair prong, Plaintiff and Class members need not establish that these statutes were actually violated, although the claims pleaded herein do so.

142. Defendant's conduct constitutes unfair business practices under the UCL because these practices offend established public policy protecting confidential communications, including guest records, and hurt Plaintiff and class members, which cannot be reasonably avoided, and that outweighs any benefit to consumers or competition. The conduct also is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

143. Defendant's appropriation of class members' private, personal data and communications was to its economic and commercial advantage. Defendant has

generated substantial revenue from this unlawful practice through its provision of targeted advertising.

144. At no time has Defendant affirmatively sought consent from class members before appropriating their private, personal data and communications. (And Marriott and Hilton specifically promised they would not share booking information with third-parties, like Sojern, for marketing purposes.) Plaintiff and class members did not consent to the interception of their confidential communications, including booking information, and data from the hotels within Sojern's marketing enterprise.

145. Plaintiff and class members received no compensation from Defendant's use of their private, personal data and communications.

146. California's UCL allows anyone to bring an action for injunctive relief if they have "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. § 17204.

147. Plaintiff lost money or property because of Defendant's unfair and unlawful practices in violation of the UCL. If not for its violation of the law, Defendant would have paid Plaintiff and Class members for consent to use their personal information and communications or ceased such use.

148. Defendant's actions caused damage to and loss of Plaintiff's and Class members' right to control the dissemination and use of their personal information.

149. Plaintiff's and class members' private, personal data and communications are likely to remain available to Defendant, without Plaintiff's and class members' consent, and without compensation from Defendant for its appropriation and use. Indeed, the longer Defendant is allowed to continue its practices the more information that it can unfairly and unlawfully collect.

150. Plaintiff seeks an order to enjoin Defendant from such unlawful, unfair and fraudulent business acts or practices and to restore to Plaintiff her interest in

money or property that might have been acquired by Defendant through unfair competition.

151. Defendant reaped unjust profits and revenues in violation of the UCL. This includes Defendant's profits and revenues from their targeted advertising. Plaintiff and the Class seek restitution and disgorgement of these unjust profits and revenues.

152. Plaintiff pleads this claim separately as well as in the alternative to her claims for damages under Federal Rule of Civil Procedure 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of Sojern on the damages claims, Plaintiffs will have no adequate legal remedy.

## Count IV

### Unjust Enrichment

153. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

154. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

155. Plaintiff and Class members conferred a benefit on Defendant in the form of personal, private data which has substantial monetary value that Defendant extracted and used to produce revenue and unjustly retained those benefits at the expense of Plaintiff and Class members.

156. Defendant collected and used and made available this information for their own gain, reaping economic, intangible, and other benefits.

157. Defendant unjustly retained those benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

158. Plaintiff and Class members did not consent to the collection and use of their personal, private data, nor did they have any control over its use. Therefore,

under principles of equity and good conscience, Defendant should not be permitted to retain any money derived from their use of Plaintiff and Class members' personal, private data.

159. The benefits that Defendant derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles to permit Defendant's retention of any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

160. Plaintiff pleads this claim separately as well as in the alternative to her claims for damages under Federal Rule of Civil Procedure 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of Sojern on the damages claims, Plaintiffs will have no adequate legal remedy.

## Count V

### Violations Of Electronic Communications Privacy Act ("ECPA")

### 18 U.S.C. § 2511(1) *et seq*.

### Unauthorized Interception, Use and Disclosure

161. Plaintiff and Class Members repeats and re-alleges each and every allegation in the Complaint as if fully set forth herein.

162. Plaintiff brings this claim against Defendant individually and on behalf of the Classes.

163. The ECPA protects both sending and receipt of communications.

164. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

165. The transmissions of Plaintiff's booking information to hotels within the Sojern marketing enterprise qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

166. **Electronic Communications**. The transmission of booking information between Plaintiff and Class Members and hotels within the Sojern marketing enterprise are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

167. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

168. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

169. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices (including mobile devices);

c. Sojern's web-servers;

d. The hotels within the Sojern marketing enterprise's web-servers;

e. The hotels within the Sojern marketing enterprise's websites; and

f. The Sojern Tracking Pixel codes deployed by Hilton and other hotels in the Sojern marketing enterprise to effectuate the sending and acquisition of guest communications.

170. By encouraging, promoting, and enabling the Sojern Tracking Pixel to be utilized and embedded on websites within the Sojern marketing enterprise, (and hence causing the placement of the Sojern Tracking Pixel on guest's computers), Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff's and Class Members', in violation of 18 U.S.C. § 2511(1)(a).

171. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Sojern Tracking Pixel, which tracked and unlawfully disclosed Plaintiff's and Class Members' booking information to Sojern.

172. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding booking information.

173. By intentionally intercepting or endeavoring to intercept or procuring Hilton and other hotels in the Sojern marketing enterprise to intercept the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

174. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

175. Sojern is not a party to website user's communications with hotel websites. The guests booking hotels at hotels within Sojern's marketing enterprise were intending to communicate with the hotels, not Sojern. Sojern is an independent entity that provides tracking technology that intercepts communications with hotel guests, which Sojern uses for marketing purposes, including marketing on behalf of

other travel providers, for Sojern's profit. Sojern's technology does not merely passively record the communications for the hotel's benefit. Rather, Sojern has the capability to use the information it collects via the Sojern Tracking Pixel for its own purposes, and, in fact, does use that information for its own purposes, including as described above. Accordingly, Sojern is a third party to any communication between Plaintiff and Class Members, on the one hand, and the hotels that participate in the Sojern marketing enterprise, on the other.

176. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632; Cal. Civil Code § 53.5; and intrusion upon seclusion and invasion of privacy.

177. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Sojern Tracking Pixel to track and utilize Plaintiff's and Class Members' booking information / guest records for financial gain.

178. Defendant was not acting under color of law to intercept Plaintiff and Class Member's wire or electronic communication.

179. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Sojern Tracking Pixel tracking codes.

180. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

181. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to booking information / guest records, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion

into a private, place, conversation, or matter that would be highly offensive to a reasonable person; (ii) violation of California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632; and (iii) aiding and abetting the violation of Cal. Civil Code § 53.5.

**Count VI**

**Invasion of Privacy**

182. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

183. Plaintiff brings this claim against Defendant individually and on behalf of the Classes.

184. The right to privacy in California's constitution creates a right of action against private entities such as Defendant.

185. Plaintiff's and Class members' expectation of privacy is deeply enshrined in California's Constitution. Article I, section 1 of the California Constitution provides:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, and privacy.

186. The phrase "and privacy" was added by the "Privacy Initiative" adopted by California voters in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Critically, the argument in favor of Proposition 11 reveals that the legislative intent was to curb businesses' control over the unauthorized collection and use of consumers' personal information, stating:

> The right of privacy is the right to be left alone… It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one

> purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[16]

187. The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

188. To plead a California constitutional privacy claim, a plaintiff must show an invasion of (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

189. As described herein, Defendant has intruded upon the following legally protected privacy interests:

i. The federal Wiretap Act (ECPA), California Wiretap Act, Cal. Civil Code § 53.5, and other California common-laws as alleged herein;

ii. A Fourth Amendment right to privacy contained on personal computing devices, including web-browsing history, as explained by the United States Supreme Court in the unanimous decision of *Riley v. California*; and

iii. The California Constitution, which guarantees Californians the right to privacy;

190. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiff and Class members could not reasonably expect Defendant would commit acts in violation of federal and state civil and criminal laws.

---

[16] BALLOT PAMP., PROPOSED STATS. & AMENDS. TO CAL. CONST. WITH ARGUMENTS TO VOTERS, GEN. ELECTION *26 (Nov. 7, 1972).

191. Defendant's actions constituted a serious invasion of privacy in that it:

iv. Invaded a zone of privacy protected by the Fourth Amendment, namely the right to privacy in data contained on personal computing devices, including browsing histories

v. Violated federal and state laws on eavesdropping and invasion of privacy, including the California Invasion of Privacy Act, and aided and abetted the violation of Cal. Civil Code § 53.5;

vi. Invaded the privacy rights of thousands and thousands of Americans (including Plaintiff and Class members) without their consent;

vii. Constituted the unauthorized taking of valuable information from millions of Americans through deceit; and

viii. Further violated Plaintiff's and Class members' reasonable expectation of privacy via Defendant's review, analysis, and subsequent uses of Plaintiff's and Class members' private browsing activity that Plaintiff and Class members considered sensitive and confidential.

192. Committing the above privacy violations against thousands and thousands of Americans constitutes an egregious breach of social norms that is highly offensive.

193. The surreptitious and unauthorized tracking of the confidential booking information of thousands and thousand of Americans, particularly where, as here, California state law specifically protects guest records from disclosure, constitutes an egregious breach of social norms that is highly offensive.

194. Defendant's intentional intrusion into Plaintiff's and Class members' computing devices and web-browsers was highly offensive to a reasonable person in that Defendant violated state criminal and civil laws designed to protect individual privacy and against theft.

195. The taking of personally-identifiable information from thousands and thousands of Americans through deceit is highly offensive behavior.

196. Secret monitoring and recording of private booking information / guest records is highly offensive behavior.

197. Eavesdropping on confidential communications with hotels is highly offensive behavior.

198. Following Defendant's unauthorized collection of the sensitive and valuable personal information, the subsequent analysis and use of the private booking information / guest records to target Plaintiff, Class members, and consumers with advertising violated their reasonable expectations of privacy.

199. Defendant lacked a legitimate business interest in analyzing users' data and tracking users while guests were booking their hotels to target them with advertising without their consent.

200. Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation and injunctive relief.

**Count VII**

**Intrusion Upon Seclusion**

201. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

202. Plaintiff brings this claim against Defendant individually and on behalf of the Classes.

203. Plaintiff asserting claims for intrusion upon seclusion must plead (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

204. In carrying out its scheme to track Plaintiff's and Class members' communications with hotels in the Sojern marketing enterprise, Sojern intentionally intruded upon the Plaintiff's and Class members' solitude or seclusion in that Sojern

placed itself in the middle of a private place, conversation, or matter to which they were not authorized.

205. Defendant's tracking was not authorized by the Plaintiff and Class members.

206. Defendant's intentional intrusion into their computing devices and web-browsers was highly offensive to a reasonable person in that they violated state and federal laws designed to protect individual privacy.

207. The taking of personally-identifiable information from hundreds of thousands of Americans through deceit is highly offensive behavior

208. Secret monitoring of private web browsing is highly offensive behavior.

209. Surreptitious recording of communications of the same is highly offensive behavior.

210. Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is only heightened when the information is specifically protected under Cal. Civil Code § 53.5.

211. Plaintiff and the Class members have been damaged by Defendant's invasion of their privacy and are entitled to reasonable compensation including but not limited to the value of the data that was taken and disgorgement of profits related to the unlawful internet tracking.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief and judgment against Defendant as follows:

A. For an order certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23;

B. For an order appointing Plaintiff and her counsel to represent the Class;

C. For an order declaring that Defendant's conduct violates the statute referenced herein;

D. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

E. For an order enjoining Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with it, from the misconduct described herein;

F. For an award of statutory, actual, compensatory, and/or nominal damages as permitted by applicable law;

G. For restitution to the extent permitted by applicable law;

H. For pre-judgment and post-judgment interest;

I. For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

J. For such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the Class, demands a trial by jury on all issues so triable.

Dated this 16th day of October, 2025.

DWOSKIN WASDIN LLP

*/s/ Eric S. Dwoskin*

Eric S. Dwoskin (admitted *pro hac vice*)
433 Plaza Real, Ste. 275
Boca Raton, FL 33432
Phone: (561) 849-8060
edwoskin@dwowas.com

Robert G. Loewy (SBN 179868)
rloewy@rloewy.com
LAW OFFICES OF ROBERT G. LOEWY, P.C.
20 Enterprise, Suite 310
Aliso Viejo, CA 92656
Tel: (949) 468-7150

*Attorneys for Plaintiff and the Putative Class*

**E-FILING ATTESTATION**

I, Eric S. Dwoskin, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Eric S. Dwoskin*
Eric S. Dwoskin