UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---

SUELLEN CRANO, Individually and on behalf of other similarly situated individuals,

Plaintiff,

vs. NO. 3:25-CV-2600-JSC

SOJERN, INC.,

Defendant.

---

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY

Appearing on behalf of the Plaintiff:

ERIC SCOTT DWOSKIN
Dwoskin Wasdin LLP
433 Plaza Real, Suite 275
Boca Raton, FL 33432
(561) 849-8060
Email: Edwoskin@dwowas.com

Appearing on behalf of the Defendant:

PENCER STEPHEN PERSSON
Davis Wright Tremaine LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
(213) 633-6800
Email: Spencerpersson@dwt.com

TINA DUBOSE GIBSON, RPR, RCR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

THURSDAY

AUGUST 21, 2025

----------------------

**COURTROOM DEPUTY:** Calling Civil Action C-25-2600, Crano v. Sojern, Inc.

**MR. DWOSKIN:** Eric Dwoskin with Dwoskin Wasdin for the plaintiff. Good morning.

**THE COURT:** Good morning.

**MR. PERSSON:** Good morning, Your Honor. Spencer Persson on behalf of the defendant.

**THE COURT:** Good morning. Okay. Let's start with the motion to transfer.

My first question is whether there's any dispute that the plaintiff agreed to the Site Usage Agreement when she clicked on "book reservation."

**MR. DWOSKIN:** Yes, Your Honor, we do dispute that there was a contract formed with respect to the Site Usage Agreement.

**THE COURT:** Okay. And what is the basis for that?

**MR. DWOSKIN:** Absolutely. So there's two documents that the defendant asked the Court to consider to establish that she's clickwrapped into the Site Usage Agreement.

12:33:45 You have Exhibit A, which is a December 2024 image of the booking process. The last-in-time booking that we allege with Hilton is from April of 2024, so months before the December 2024 image. And so there's no evidence at all that she ever interacted with the December 2024 page.

12:34:11 And then, with respect to Exhibit B, which is a partial screenshot of what Hilton says existed in 2020, that document itself doesn't contain the clickwrap. If you wanted to look at what the language of the clickwrap was, you'd have to go to Exhibit J, which is a declaration that a Hilton paralegal put forward which includes a screenshot of what they say the clickwrap was, I guess, in 2020.

12:34:48 So Your Honor would have to stitch the documents together, which is not appropriate under the circumstances because it would be defendant's burden to show contract formation. And in order to show conspicuous notice, Your Honor has to consider the entire design of the booking process, the language, and so you can't stitch together documents that a Hilton paralegal put together. And you can --

12:35:13 **THE COURT:** I don't think it matters that it's a Hilton paralegal. I don't think that's correct at all. I mean, how were they supposed to do it?

**MR. DWOSKIN:** How was Sojern supposed to do it?

**THE COURT:** Yes.

**MR. DWOSKIN:** Well, I think that highlights a problem that Sojern has is that it's not their documents.

**THE COURT:** Okay. But that's a different matter whether they can take advantage, but this was filed in the action that your client filed against Hilton. She's since dismissed Hilton without prejudice.

**MR. DWOSKIN:** Correct. But -- oh, I'm sorry.

**THE COURT:** But so -- but anyway, I guess I was -- my understanding, correct me if I'm wrong, is what the evidence is, is that this Docket No. 18 at 1415: By clicking book reservation, I agree to the rules and restrictions and the Site Usage Agreement.

Is it not the case that the Site Usage Agreement is what contains the forum selection clause?

**MR. PERSSON:** Yes, Your Honor. The Honors Agreement also includes it, but, yes, the --

**THE COURT:** I think that's more problematic, the Honors Agreement, because that's not -- the Site Usage Agreement is what governs what she was doing at the time there.

**MR. PERSSON:** I'm sorry, Your Honor, were --

**THE COURT:** So I -- the forum selection clause is what we're talking about is in -- putting aside

whether they can take advantage of it for the moment.

**MR. PERSSON:** Okay.

**THE COURT:** It says: By clicking the book reservation, I agree to the Site Usage Agreement.

And she clicked on book reservation.

**MR. DWOSKIN:** Well, there's no -- are you talking -- there's no evidence that she clicked on the book reservation but in from the December 2024 screenshot. The last-in-time booking is from April 2024, which is months before the December '24, so there's no evidence that she ever interacted with that page.

**THE COURT:** Well, I thought the -- the evidence was the declaration was that it's been that way since 2020.

**MR. DWOSKIN:** That's what -- how Hilton describes it, but if you actually look at the documents themselves, that's not accurate. So the -- so if Your Honor were to stitch together Exhibit B with the screen wrap from Exhibit J, you would see that the language from 2020 is not the same as the language from December 2024. So there had been --

**THE COURT:** Materially different?

**MR. DWOSKIN:** Well, it's -- it is different.

**THE COURT:** But is it materially different? In other words, what the paralegal says is that they had to

agree it required substantially the same affirmative agreement since 2020.

**MR. DWOSKIN:** You know, I think the point is with respect to that language, I mean, what I can say is that there's various -- no evidence that she -- what she interacted with in April 2024.

**THE COURT:** Well, there is evidence of it. There isn't precise evidence of it. They don't have a screenshot from April 2024. I'm not aware of any Ninth Circuit law that requires that. Right? We get these -- there's like a new Ninth Circuit decision every week. I'm not aware of anything that requires you to have evidence of that. That's just not going to happen.

**MR. DWOSKIN:** Well, I think the evidence that is -- requires it, Your Honor has to consider the whole booking process, not just the language of the clickwrap. You also have to consider where that clickwrap is situated within the process.

**THE COURT:** Yes.

**MR. DWOSKIN:** And if you look at the Exhibit B, it's not a whole image of what that booking screen would have looked like in 2020. So I don't know sitting here -- you know, I do appreciate that, you know, Hilton's representative characterized them as substantially similar. But I don't know if that's true.

12:39:10 That was their characterization. We didn't test that in
12:39:11 discovery. So, you know, it is defendant's burden to
12:39:15 establish contract formation, and I don't believe that
12:39:16 they've carried that burden.

12:39:16 **THE COURT:** You just don't think -- you think
12:39:16 it's insufficient, your client didn't have an
12:39:19 obligation -- because she doesn't submit a declaration
12:39:22 saying, I didn't see that, I didn't click that, I didn't
12:39:26 agree to that.

12:39:28 **MR. DWOSKIN:** I mean, I think it's defendant's
12:39:30 burden to establish contract formation. I didn't think
12:39:34 we were obligated to come forward and say those facts.

12:39:37 **THE COURT:** Okay. So you don't think they've
12:39:40 made their initial burden sufficient to support an
12:39:45 inference of contract?

12:39:49 **MR. DWOSKIN:** That is my position, and then I
12:39:50 would also add to that, that, you know, it was their
12:39:53 burden in their moving papers to establish that a
12:39:57 contract had been formed and they didn't attempt to make
12:39:59 that showing in their moving papers. We pointed out in
12:40:03 our opposition that it was their obligation to do it, and
12:40:05 then they tried to make that showing essentially on
12:40:09 reply.

12:40:09 So it's also my view that not only was it their --
12:40:12 it's their burden to begin with, but they didn't make

that showing in their moving papers, which they were required to do.

**THE COURT:** Okay.

**MR. PERSSON:** Your Honor, Exhibit I is the booking form from 2020, so we included both the 2020, and then when it changed in 2025, both prior agreements to the Site Usage Agreement. I started it at page 128 of 147 of the filing.

**THE COURT:** Well, yeah. Can I just make a suggestion --

**MR. PERSSON:** Yes.

**THE COURT:** -- that would be helpful going forward?

When you file -- and I know you were filing from the other thing, exhibits -- and there's many exhibits within a document, if you could have whoever separately docket them because what happens is we have to click on that and then scroll all the way through to try to find that page, and it takes a long time.

**MR. PERSSON:** Can I just say that I felt the Court's pain in preparing for this hearing and I wholeheartedly agreed. And I also wish we hadn't attached all of these exhibits both to my declaration and to the request for judicial notice.

**THE COURT:** Okay.

**MR. PERSSON:** My apologies.

**THE COURT:** No problem. So Exhibit I.

**MR. PERSSON:** So Exhibit I is 2020, and Exhibit A is 2025 -- or end of 2024. As Your Honor pointed out, the Hilton declarant said that there wasn't a substantial change in those exhibits. It showed that there wasn't a substantial change to book a room, which plaintiff does allege that she booked a room online. You had to press that button, and that button is clickwrapped, and we didn't ask for her firstborn child or Hilton didn't ask for her firstborn child as he referenced in the first hearing; but, nevertheless, that is sufficient under clickwrap.

**MR. DWOSKIN:** So Exhibit I is Hilton honors book now on the mobile application. We don't allege that she booked in April 2024 through the mobile application, so that is totally irrelevant.

**THE COURT:** Okay.

**MR. PERSSON:** What it shows is that these -- this type of requirement for booking, whether it be on the general page with --

**THE COURT:** No. That -- I don't think so. The different applications, whether it be the cell phone, the desktop, whatever, those are often different, so I don't think you get there that way.

12:42:42 **MR. PERSSON:** Exhibit A is the 2024 booking. 12:42:48 That is an Honors page. Well, I don't see how Exhibit I 12:43:13 is the Honors because it's talking about joining Honors. 12:43:16 We can look at the declaration. My understanding was 12:43:19 that A and I were the nonHonors, and B was the Honors. 12:43:27 And, again, I have the declaration saying that they were 12:43:30 the same throughout.

12:43:32 **MR. DWOSKIN:** Yeah. So, I mean, if you want to 12:43:33 look at Exhibit I and see how they characterize it, which 12:43:37 I point you to ECF 18, ECF Page No. 3, and I just read 12:43:42 from it, Exhibit I dash Hilton Honors colon Book Now 12:43:47 mobile application booking screen for an exemplar 12:43:50 property. That's what Exhibit I is.

12:43:51 And Exhibit A is an online booking form from 12:43:57 December 2024, which as I point out, there's no evidence 12:43:59 that she ever interacted with because her last is months 12:44:02 before in April 2024.

12:44:04 **THE COURT:** Okay. But I think if there's 12:44:06 declaration testimony, that it was the same, 12:44:11 substantially the same prior to that, that supports an 12:44:14 inference that it was December 2024.

12:44:19 **MR. DWOSKIN:** Your Honor, I respectfully 12:44:20 disagree with that because, you know, it's their burden 12:44:27 to establish that it was the same.

12:44:28 And if you look at the Exhibit B, you know -- in

order to support that inference, you would have to be able to say, like, Exhibit B looked like, materially like Exhibit A, right. But if you compare Exhibit A to Exhibit B, you can't make that inference because they're not the same images, and I would just point --

**THE COURT:** I know they're not the same images. Are they materially -- do they not require agreement to the Site Usage Agreement? That is the case, by booking.

**MR. DWOSKIN:** Well, with respect to just the specific language around the Site Usage Agreement, that appears to be the same, but I don't believe that's the entire inquiry because I think Your Honor needs to consider there's a -- I wouldn't cite these cases because, again, they didn't make this argument in the moving brief, but there's a *Sellers* case. I think *Nguyen* (phonetic) is another case. There's tons of clickwrap cases that discuss this process. It's a very, very fact-specific inquiry.

**THE COURT:** You have to look at the whole page. Are you distracted to something else? Is it underlined or highlighted?

**MR. DWOSKIN:** Exactly, the whole thing. And we simply don't have in the record what it looked like, the whole thing looked like in December 2020, so we don't know if they're the same, and so I don't think they

12:45:45 carried their burden on this record.

12:45:47 **MR. PERSSON:** Your Honor, all I can say is that Exhibit B was defined both by Hilton and on the sheet as being the booking page, not the Honors booking page. I see that at the top of Exhibit B, it says, Hilton Honors, but that's not what Hilton said that was.

12:46:04 **THE COURT:** The Site Usage Agreement, was it -- you were to click on it if you wanted to see it? Was it highlighted?

12:46:14 **MR. PERSSON:** Yes. It's in blue, and it has a pop-out icon next to it --

12:46:17 **THE COURT:** Okay.

12:46:19 **MR. PERSSON:** -- such that when you click on it, you can go and link directly to it.

12:46:26 **THE COURT:** I mean, it is right above the book reservation, that's what the Ninth Circuit looks at, as well, right?

12:46:36 **MR. PERSSON:** Yes.

12:46:37 **THE COURT:** That was for him.

12:46:39 **MR. PERSSON:** I figured but nobody answered.

12:46:42 **MR. DWOSKIN:** I really don't -- you know, I just respectfully -- the analysis, it has to -- it's a totality of the circumstance. You put yourself in the shoes of the consumer and figure out how they would have -- what they would have seen through the entire

12:46:54 process.

12:46:54 Now, again, we just don't have the evidence of what
12:46:57 the entire process looked like in 2020. We have more
12:47:00 evidence of what it looked like in December 2024, after
12:47:04 she last interacted with the platform, but I don't think
12:47:06 you can draw an inference that the process was the same
12:47:09 in December 2024, as it was, you know, four years prior.

12:47:14 And one reason that supports the fact that that
12:47:17 inference wouldn't be fairly drawn and would be subject
12:47:19 to discovery is the language --

12:47:22 **THE COURT:** Wait, wait, wait, wait, that -- is
12:47:24 that why you want discovery? If that's it, then fine. I
12:47:27 think that might be fair.

12:47:29 **MR. DWOSKIN:** I mean, I just don't think they've
12:47:32 carried their burden to show contract formation. I
12:47:34 think, you know, there's many other issues why this case
12:47:37 shouldn't be transferred to the Eastern District of
12:47:40 Virginia. I mean, we can definitely get to those, but in
12:47:42 terms of, you know, whether the contract was formed, you
12:47:46 know, just to finish what I was about to say is that, you
12:47:50 know, the language of the clickwrap in total has
12:47:55 definitely changed between 2020 and December 2024.

12:47:58 **THE COURT:** Okay. But we're talking about
12:48:01 April 2024 is when she booked with Hilton.

12:48:03 **MR. DWOSKIN:** Right. So I'm saying there were

material changes made to that page in that time period and, you know, we don't know what those are.

**THE COURT:** All right. Well, I'll just have to go back and look at the --

**MR. PERSSON:** Your Honor, I would only say he keeps calling it an inference. It's not an inference. We put out the evidence. Exhibit A was in 2024, Exhibit B was in 2020, and a declarant from Hilton said that there were no substantial changes particularly as related to the forum provision. And so that's enough. It's not an inference. It's evidence, and they didn't rebut it.

**THE COURT:** Okay. Let's then look at whether this dispute is covered by that forum selection clause. And here, I think even though we're talking about a forum selection clause, aren't the arbitration cases on point, as well? because an arbitration provision is essentially a forum selection clause, as well.

**MR. DWOSKIN:** There's definitely a lot of similarities there.

**THE COURT:** Yeah, okay. I think we're looking at the same, which is interesting, because I don't think in terms of whether the contract was made, to begin with, with the forum selection clause. In order to enforce it, I'd have to conclude that there's no genuine dispute as

12:49:22 to the contract being made.

12:49:24 If there is a genuine dispute, then what you do is
12:49:27 you have a little trial on that. But, anyway, I don't
12:49:30 know that we're there.

12:49:31 So why doesn't -- I mean, this lawsuit is about
12:49:39 information that was shared based on her booking her
12:49:43 reservation on the Hilton site, right? That's where they
12:49:48 got -- Hilton got the information through Sojern's
12:49:53 software. But the allegation then was shared with
12:50:00 Sojern. Why doesn't the dispute arise out of the Site
12:50:05 Usage Agreement?

12:50:07 **MR. DWOSKIN:** Before you get to the question of
12:50:09 the scope of the Site Usage Agreement, I think you have
12:50:11 to ask the prior question of whether Sojern has the right
12:50:18 to --

12:50:19 **THE COURT:** When we get to that question, I'm
12:50:20 flipping them.

12:50:21 **MR. DWOSKIN:** Oh, okay, so --

12:50:23 **THE COURT:** That is a big question, as well, but
12:50:25 first, I just wanted to get the scope.

12:50:27 **MR. DWOSKIN:** Okay. So -- I don't know. If
12:50:32 we're just looking at the scope of the Site Usage
12:50:37 Agreement?

12:50:37 **THE COURT:** The site.

12:50:37 **MR. DWOSKIN:** Yes. So the site usage clause is

limited to the terms of the agreement referring to the Site Usage Agreement. The Site Usage Agreement itself does not reference Hilton's global privacy statement.

The Site Usage Agreement, if you look at what that is about, it's not about privacy. That's under -- in Hilton's documents, that's taken care of with a separate document, their privacy statement.

To figure out what this lawsuit is about -- and I just want to go back to what Your Honor sort of characterized it as. You know, first of all, it's not just about Hilton. It's also about Marriott, and then this is a class --

**THE COURT:** See, and that's a different matter. But they are moving to enforce the -- it was originally just about Hilton.

**MR. DWOSKIN:** That's true.

**THE COURT:** That's fine. I mean, that's what you do. You try -- you want to be here, not there. And neither Hilton nor Marriott are parties, so I just don't -- so I think we can just focus -- so it is, in part, in large part, about Hilton. Her use of the Hilton website, right?

**MR. DWOSKIN:** The case is about Sojern spying on our plaintiff's communications, and our plaintiff is in California and Sojern is also in California. And the

12:52:02 data transmissions went from my client's browser to
12:52:07 Sojern, and so the material part of this case really all
12:52:11 is based in California.

12:52:12 **THE COURT:** And its California statutes?

12:52:19 **MR. DWOSKIN:** And its California statutes,
12:52:19 adding that on. But in terms of the scope of the case,
12:52:21 does this case arise from the terms of the Site Usage
12:52:26 Agreement? It does not. It has nothing to do with that.

12:52:28 In Sojern's view, they have a defense to the consent
12:52:33 element of the claim. Our client says it's a matter of
12:52:39 facts she did not consent. They're saying she did
12:52:41 consent, and they're going to point to Hilton's global
12:52:45 privacy statement to try to support that factual
12:52:49 argument. But that's their defense.

12:52:53 That's their defense, and so if you allow a
12:52:57 defendant to use their defense to get it within the --
12:53:02 the scope of the clause, then you're essentially allowing
12:53:06 the defendant to craft the scope of the pleadings.

12:53:09 **THE COURT:** So it's not just the defense because
12:53:11 some of your CIPA claims require the plaintiff to prove
12:53:14 lack of consent. That's an element of the plaintiff's
12:53:18 claim.

12:53:18 **MR. DWOSKIN:** It is an element of 631(a) claim,
12:53:20 Your Honor, but we would, you know, prove that element
12:53:23 essentially with our plaintiff's testimony. She would

testify she didn't consent, and so there's nothing to do with that document in terms of plaintiff's prima facie --

**THE COURT:** Of course it has something to do with it because it's right there that it says that you consent to certain privacy. She'll say whatever she says. But to say -- yeah, so I --

**MR. DWOSKIN:** Right.

**THE COURT:** What's your best case that I would look at to conclude that this dispute is not related to or that the forum selection clause in the Site Usage Agreement would not govern this lawsuit?

**MR. DWOSKIN:** I'm not sure that there's a case that I would directly point you to. I would -- I'm really making an argument based upon the language of the clause themselves and how the documents are situated and what our pleadings are.

**THE COURT:** Okay. All right.

**MR. PERSSON:** Your Honor, it says arising out of or relating to the site usage. The claim here is that plaintiff went on the site, that Hilton had loaded Sojern's software onto the site and that's the genesis of all the claims, and so it absolutely relates to the use of the site and the Site Usage Agreement would apply.

As Your Honor points out in forum nonconveniens cases that they typically -- the Courts typically have,

including the Northern District, looked at arbitration cases and construed language broadly just as they do in arbitration.

**THE COURT:** Okay. Now, let's get to the nub of the matter which is whether Sojern, who is not a party to the Site Usage Agreement, can enforce it. And there, again, I think the case law is going to be -- excuse me, in the arbitration for third parties, move to compel arbitration based on -- arbitration agreements to which they're not applying.

**MR. DWOSKIN:** I think the relevant case law is the Ninth Circuit case law that we cite, cite in our brief, Your Honor, in our response to show cause, which is in the forum selection.

**THE COURT:** *Manetti-Farrow*?

**MR. DWOSKIN:** Yeah, exactly. That's *Manetti-Farrow,* exactly.

**MR. PERSSON:** That's a point where we would actually agree with plaintiff. The forum nonconveniens area, there are a couple of Ninth Circuit cases, and it's about the closely related and foreseeable test which, you know, we cited the *Baton v. TaskUs* case. I represented TaskUs.

**THE COURT:** Yeah, but of course Judge Chen certified that for interlocutory appeal.

12:55:56 **MR. PERSSON:** That was my suggestion, Your Honor, because the alternative was to enter judgment beforehand; and I said, why don't we see if the Ninth Circuit actually wants to --

12:56:02 **THE COURT:** Oh, that's your case?

12:56:03 **MR. PERSSON:** That's my case.

12:56:03 **THE COURT:** Okay.

12:56:04 **MR. PERSSON:** So but the closely related and foreseeable test is -- you know, it's been around since the early '80s and has been adopted in the Northern District. And here, given the allegations again that Hilton loaded Sojern's software onto the site for the operation of its site and for its advertising purposes would make it closely related to the site usage, would make it -- and the various policies agreed to, including the site usage, would make it foreseeable that someone would have a vendor that helps them with the operation of their site. Not every company is a tech company that does everything in-house.

12:56:46 **MR. DWOSKIN:** Your Honor, I just -- so in terms of (indecipherable) America and *Manetti-Farrow,* which are the two Ninth Circuit cases that are -- that address this context, those were cases involving factual scenarios where the entities were affiliated with each other.

12:57:01 In terms of the language of foreseeability, that

language doesn't appear in the Ninth Circuit case law. That language appears in Second Circuit case law, which was relied upon in the *Baton* case. The Second Circuit case is a case called *Magi*, and looking at that case, the facts in that case, one can see how distinct they are from the facts here. So in the --

**THE COURT:** Can I just stop you for a second?

**MR. DWOSKIN:** Yes, absolutely.

**THE COURT:** *Manetti-Farrow* and *Holland* are old, right. *Holland* is 2007. *Manetti-Farrow,* 1988. I'm not sure that's right anymore. In other words, since then, we've had an explosion of arbitration cases and even the last few years with respect to this third party invoking the arbitration agreement. I don't know why those cases wouldn't govern.

Like, why is a forum selection clause any different from an arbitration clause in terms of whether a third party can invoke it? because isn't just an arbitration a different species of forum selection?

**MR. DWOSKIN:** It's an interesting question, Your Honor, and I don't necessarily have, you know, a view right now as to why they might be different. I know there is Ninth Circuit case law on -- there was a *Stafford v. Rite Aid* case involving arbitration where you essentially had, like, a known third party and the Court

said because the claims that the plaintiffs were bringing were not essentially based in the third-party contracts that, therefore, you shouldn't compel arbitration. The Ninth Circuit affirmed the district court in that case. I know that case because that was my case.

But the principle is when you -- I agree those are older cases, but the principles themselves are, I think, applicable here when you talk about -- obviously, they're applicable. When the Ninth Circuit talks about, okay, well, are they a participant in the transaction? Well, here, Sojern is not a participant in the transaction. They are eavesdropping on a conversation between guests and hotel.

**THE COURT:** They're eavesdropping at Hilton's invitation. In fact, Hilton is paying Sojern to do so, right. So that's a little bit -- that's a little bit different to say are they a participant.

**MR. DWOSKIN:** Well, the consumer certainly has no idea about Sojern's involvement. That is totally unknown. They don't call out Sojern. There's no pod of Sojern in any privacy policy and --

**THE COURT:** There's no requirement that they do so, right, when you say, click and I agree to your privacy policy. And then you don't read it, to be honest, but you know it's not Hilton necessarily. It's

01:00:00 Google Analytics, which is downstairs on trial right now.
01:00:06 But I'm wondering, though, if maybe if we get to this question whether we shouldn't have more briefing because I, for the life of me, can't figure out why it wouldn't be the same analysis as the arbitration cases in which we now have lots and lots of guidance.

01:00:27 **MR. PERSSON:** So having briefed this in another case, the answer to the question is, while it's related to third-party beneficiary law that might be applied in an arbitration context, among other contexts, the reason why the analysis has been different in various circuit courts on closely related and foreseeable is because in third-party beneficiary law, often there is an element of reciprocity where the person trying to take advantage of the provision was also bound by the overall agreement in some instances. Where in closely related and foreseeable fact has not been required.

01:00:57 You can take advantage of the forum selection clause, but you don't need to look at the rest of the agreement. That's how it's been analyzed. I'm not saying Your Honor has to agree with it.

01:01:10 **THE COURT:** All right.

01:01:12 **MR. DWOSKIN:** I was going to say the *Magi* case, which is a more recent case from the Second Circuit, which apply to a foreseeability analysis in a forum

selection, I think also describes a factual circumstance, which is very, very distinct from what we have here, and so maybe that is a useful guidepost.

What you had in the *Magi* case was, essentially, you had Vatican entities wanted to commercialize Vatican IP. They entered into a master license agreement with another entity called Second Renaissance. And then, Second Renaissance entered into a sublicense with the plaintiff, which was a corporate plaintiff essentially called *Magi*, and there was a dispute that arose out of the sublicense essentially, and *Magi* sued both second license, and there was a forum selection -- Second Renaissance, there was a forum selection clause in the sublicense, and then there was a forum selection clause in the master license between the Vatican entities and Second Renaissance. And so *Magi* sued the Vatican entities directly, and the Vatican entities wanted to enforce essentially the forum selection clause in these licenses.

The Second Circuit said, basically, that was foreseeable in large measure because *Magi* knew that the Vatican -- it was the Vatican IP that they were licensing, and also the Vatican had approval rights over the IP.

Again, that factual circumstance just shows you how narrow this doctrine is. I mean, typically, as a matter

01:02:49 of contract, only parties to a contract would enforce that contract. And here, we're outside of that basic contract 101 principle, so we need a very narrow construction of any exception here.

01:03:03 And if you look at the factual circumstances of, again, the *Magi* case, which is a more recent case, you have an entity that's open and obvious and one with approval rights. Certainly, that's just not the case here. Sojern has no approval rights over Hilton's terms of service they have and vice versa.

01:03:21 Again, you have a consumer, which has no idea that their booking records are being disclosed to a third party. And even in the *Baton* case, which is another recent -- relatively recent case from this district which Sojern cites, again, it's a very factually distinct circumstance.

01:03:41 In that case, you had basically a data breach involving a website that was operated by Shopify. The product that was being sold was a cryptocurrency wallet offered by Ledger, and in that -- in the *Baton* case, the Court basically said, well, okay, because Shopify operates and maintains the website and they were basically necessary to the payment transaction that was issuing the data breach, it could be foreseeable in that circumstance.

01:04:09 **THE COURT:** The Court also extended it to the Shopify subcontractor, right?

01:04:14 **MR. DWOSKIN:** That's a very, very -- that is something of an outlier. That's at the very, very end of what might be possible under this doctrine. But, again, if you look at the circumstances of what drove even that Court's analysis, you know, did the entity own and operate the website? Here, that's not true. Were they a necessary part of the transaction? Here, that's not true.

01:04:40 **THE COURT:** I mean, it is complicated here because Sojern had nothing to do with this forum selection clause. No control, nothing. Sojern is here. Plaintiff is here. The claims are California. It is uncomfortable to say you're going to then ship it off to Virginia when it's clear there's no reason to do so other than forum shopping, right.

01:05:04 I mean, it makes no sense in terms of the administration of justice to ship it there. There's no -- I don't want to say valid reason, but there's no reason going to a decision on the merits to send it. There's no convenience, there's no factor, there's zero factors.

01:05:24 Now, they didn't argue sort of public interest, and they can't because of the forum selection clause, but I

do see that there is some difference with this forum selection clause than from arbitration given that we're asking a Virginia court to adjudicate these California claims, which are subject to vigorous litigation at the moment. It just seems odd.

**MR. PERSSON:** I agree with Your Honor that that's in the public interest portion of the analysis, and while I think, ultimately, the Court need not get there because of the agreement to the terms, the public interest -- our argument there was much stronger when the *Hilton* case was still going on. I recognize that, but that case was also dismissed abruptly and without prejudice. It could be brought again.

**THE COURT:** Yeah. I mean -- no. I agree. It's -- but -- I mean, I don't know what to do with that either. You can dismiss it with prejudice. And, certainly -- I mean, I could see maybe why you didn't bring them together because Sojern might -- I don't know why. I mean, you could have brought them together. It would make a lot of sense to bring them together, right, as well.

Okay. All right. I'm going to have to look at that, all of this.

**MR. DWOSKIN:** Can I just raise one other point in the argument --

01:06:44 **THE COURT:** Yes.

01:06:46 **MR. DWOSKIN:** -- Your Honor, which is the argument under 1404(a), which is that transfer wouldn't be appropriate under 1404(a) because in order to base transfer on a consent, it has to be mutual consent before the lawsuit was filed. That's from the *Hoffman v. Blaski* case.

01:07:00 **THE COURT:** Which case?

01:07:10 **MR. DWOSKIN:** *Hoffman v. Blaski.* We didn't -- that's a Supreme Court case. It's 363 U.S. 335.

01:07:15 **THE COURT:** You didn't cite it.

01:07:16 **MR. DWOSKIN:** We did not. We didn't have a chance to cite it because they raised this issue on reply, and so -- but it has to be mutual consent prior to the time the lawsuit is filed, and they can't show that here. There's no contract between Sojern and my client, which has a --

01:07:33 **THE COURT:** No, I understand that. So what about that?

01:07:36 **MR. PERSSON:** Well, I haven't -- I have not read that case. But plaintiff consented. We are consenting now.

01:07:44 **THE COURT:** He doesn't disagree with that.

01:07:47 **MR. PERSSON:** Doesn't disagree with that. I would say that I don't think that in any of the cases

that have addressed the closely related and foreseeable test, you know, these -- even these affiliates, when they're affiliated entities, they don't necessarily know of the selection clause in advance such that they consented, so I would be very surprised if that was the analysis. I don't think that that was the analysis in the other cases.

Happy to address it if Your Honor would like it to be addressed.

**THE COURT:** Okay. I'll look through all that and see.

Okay. Let's then talk about the motion to dismiss, briefly. So the Article 3 standing, I don't understand that argument.

**MR. PERSSON:** It's not injury in fact. It's traceability. And so what we're saying here is that they expressly allege that Hilton installed Sojern's software on the Hilton site.

**THE COURT:** Yes.

**MR. PERSSON:** They have an agreement. What that agreement says, we think Your Honor can look at. We don't need to even talk about that, though, right now because they admit that they are a Hilton Honors member, they admit that they booked on the Hilton site, and they admit that Hilton loaded the Sojern software. So any

01:09:08 injury that they have is traceable and based on their
01:09:13 relationship, her relationship with Hilton. It's a
01:09:14 traceability argument.

01:09:14 **THE COURT:** But for Sojern software, she
01:09:17 wouldn't have been injured.

01:09:19 **MR. PERSSON:** But injured by whom?

01:09:21 **THE COURT:** By Sojern and Hilton. The fact that
01:09:24 there's more than one tortfeasor does not mean that you
01:09:29 can't be traced to the injury.

01:09:31 **MR. PERSSON:** Sure. But what I would analogize
01:09:35 this to is more in the context of contractor or
01:09:39 subcontractor law. So now, Your Honor, sometimes you can
01:09:43 sue a subcontractor, but only sometimes. Usually, it's
01:09:46 when the subcontractor didn't do what the contractor said
01:09:49 or was negligent in some way independent of the
01:09:52 contractor.

01:09:53 In those instances, a plaintiff might be able to sue
01:09:55 the sub but, typically, the plaintiff's cause of action
01:09:59 is against the primary contractor, and so it is here that
01:10:01 the contractor --

01:10:02 **THE COURT:** That's not a good argument. This --
01:10:04 I see this more and more where defendants are arguing the
01:10:08 merits on Article 3 and I don't think I -- I'm not -- I'm
01:10:14 not persuaded there. I don't think that's an Article 3
01:10:17 standing issue, so I think that's alleged.

01:10:24 And also, I would think -- I mean, what is your case? Like, this is not a unique case here. So what is your case that would support there's no Article 3 standing because Sojern's software was installed by Hilton as opposed to the plaintiff?

01:10:42 **MR. PERSSON:** When we approach it that narrowly, I don't know that I have a direct case on point, but there are cases on traceability in the data breach context and where they found that an injury isn't traceable where, for example, the data breach was caused by -- by -- let me start that sentence over.

01:11:05 When the notice letter went out in the name of the entity who was breached and then some other entity gets sued, even though they didn't have the breach, the Courts have found that the injury was traceable to the entity that was breached, not necessarily the entity who wasn't breached. So it's come up in that context in the past.

01:11:24 Similarly here, we would say that's analogous because the relationship was with Hilton. She booked with Hilton.

01:11:31 I can see you're not at all persuaded by this argument, but I mean, I think it's a valid one.

01:11:40 **THE COURT:** The relationship was with Hilton; and according to the allegations of the complaint, also with Sojern, but she didn't know it.

01:11:49 **MR. PERSSON:** But Hilton installed the software that then caused the injury. They made that decision. So that's the traceability argument.

01:11:52 **THE COURT:** Maybe Sojern would then have a claim against Hilton, but I bet it's the other way around that Sojern is going to have to indemnify Hilton.

01:12:02 Anyway, okay. But let's talk about the CIPA claims then, and I think you're conceding there's no Clause 1 here, no 631(a)(1), right?

01:12:10 **MR. DWOSKIN:** Yeah, there's no first clause, 631(a). That's correct, Your Honor.

01:12:12 **THE COURT:** Okay.

01:12:13 **MR. DWOSKIN:** By the way, I wholeheartedly agree with Your Honor's points on Article 3 standing and traceability.

01:12:19 **THE COURT:** Right. Sorry I didn't ask.

01:12:21 Okay. So I'm -- I don't think I can do the consent as a matter of law here on this record. I'm not sure I can even consider it on the 12(b)(6) as opposed to the motion to transfer, right, because it's well established on a motion to transfer, you can consider materials outside the complaint. I can't on a 12(b)(6).

01:12:50 **MR. PERSSON:** Your Honor, look, there are cases that go both ways on judicially noticed and privacy policies in this instance where plaintiff has alleged

01:13:00 that she is an Honors member. She has alleged that she
01:13:06 booked on their website. You can go to the website.
01:13:09 It's not reasonably susceptible to dispute that that
01:13:13 button invokes the privacy policy among other items.

01:13:16 **THE COURT:** But we also have the Marriott
01:13:18 allegations.

01:13:19 **MR. PERSSON:** We do, and we put in the Marriott.
01:13:22 The Marriott had the exact same buttons, and so not every
01:13:25 case is required --

01:13:26 **THE COURT:** Not the same disclosure.

01:13:28 **MR. PERSSON:** Not the same -- well, very similar
01:13:32 disclosures, though, about the use of the third-party --

01:13:35 **THE COURT:** I think there is Ninth Circuit law
01:13:36 that it's much more nuanced in terms of consent, at least
01:13:40 on a motion to dismiss.

01:13:42 But what I'm wondering is what are the allegations
01:13:45 that plausibly support an inference of attempting to read
01:13:49 or learn the contents of the communication while in
01:13:52 transit?

01:13:57 **MR. DWOSKIN:** So in going to the intrinsic
01:13:59 requirement, Your Honor, this is actually very similar to
01:14:01 your *Sussex Publishers* case. So in terms of -- the
01:14:07 intrinsic requirement is basically a point-to-point
01:14:11 requirement, and so in our allegations Sojern's tracking
01:14:16 pixel takes the communications, essentially from the

browser, and redirects it to itself, and then it reaches their servers at Sojern.

And the reading or attempting to learn the contents of that message, it begins as soon as they have it in their possession, which is when they get it from the user's browser and then when it comes back to their servers.

**THE COURT:** So before it hits their servers, how are they attempting to read it?

**MR. DWOSKIN:** Because they have it in their possession.

**THE COURT:** Okay. I understand that. How are they attempting to read it?

**MR. DWOSKIN:** Well, it's a --

**THE COURT:** This is an eavesdropping statute. I think what you need to do is go to the legislature, which by the way, the California legislature loves to pass laws. And so if they actually wanted this law to cover these communications, I don't think they would hesitate to pass it.

This is an eavesdropping, and so that in-transit requirement is important because that's what eavesdropping is, it's contemporaneous; and I don't see any allegations here that plausibly support an inference that while it's in transit before it hits those servers

that they're attempting to read it, understand it, analyze it, anything, right. It's just being -- once it gets there, I get it, that's alleged. They analyze it.

**MR. DWOSKIN:** Well, Your Honor, in terms of, you know -- so if Your Honor accepts the plausibly allege that they read it or learn the context of it once it gets to their servers, I think that that is sufficient under the disjunctive reading of the in-transit requirement.

**THE COURT:** I don't -- I don't -- I don't -- what California case reads that way?

**MR. DWOSKIN:** Okay. So I think you have the *Ribas* case, which is a California Supreme Court case which describes the clause as an either/or statute; and you also have the *Revitch* case, which accepts -- is a case in the Northern District of California, which accepts that reading of the statute.

**THE COURT:** Okay. So I want you to address that because they do allege that it gets to Sojern, and they have it there. And so what they're saying is you have to read or attempt to read it if it's received at any place within this state.

**MR. PERSSON:** Your Honor already addressed this expressly in *Valenzuela v. Keurig Green* where Your Honor said the key word is "while." The key word in the statute is "while" when you're talking about being sent

01:17:03 from, received or any place within the statute. The
01:17:05 "while" still means that there's an in-transit
01:17:08 requirement.

01:17:09 **THE COURT:** Oh, I did.

01:17:10 **MR. PERSSON:** You did a great job.

01:17:15 **THE COURT:** All right. I'll go back and look at
01:17:17 that and look at *Ribas* again. Maybe I was wrong.

01:17:24 **MR. DWOSKIN:** And then, I would also on this
01:17:26 point, I think Your Honor cited this language in *Sussex*
01:17:30 *Publishers* but from the *Ambriz v. Google* case, which
01:17:34 rejected the argument that Google software does not learn
01:17:37 the contents of the communication when DCCAI, which I
01:17:43 think is the tracking tool, learns the contents of the
01:17:47 call. That's the same as Google learning it.

01:17:49 **THE COURT:** Yeah, but you don't have anything
01:17:50 that says they learn the contents of it. There was
01:17:55 allegation -- I think it was the third round of
01:17:59 complaints -- that it actually did. We'll see what the
01:18:04 record, what the evidence actually shows. I don't know
01:18:08 what the allegation is that they actually learn it as
01:18:12 opposed to it being sent.

01:18:16 I mean, I could have a communication in my hand, but
01:18:20 just because I'm walking with it somehow doesn't mean I'm
01:18:24 learning it or eavesdropping, right?

01:18:28 **MR. DWOSKIN:** I think it's a commun- -- so

putting aside the question of -- the statute talks about received at. So it sounds like, you know, while on board there, but in terms of the -- in our view, when Sojern's tracking pixel has the entire contents of the communications in their possession, that is equivalent to them reading or learning the --

**THE COURT:** I know that's your position, but that just means it's not a -- that's why I say just go to the legislature because that's not what the statute says. It's an eavesdropping. That's what it was designed for. I understand. Now we're trying to craft it onto this new stuff.

Okay. And then --

**MR. DWOSKIN:** I think --

**THE COURT:** Yes?

**MR. DWOSKIN:** On that point, I mean, if you think about, you know, a traditional view of eavesdropping, if I were to, you know, place a bug on someone's computer and, you know, record that communication as it was happening and then listen to that recording later, that would be an eavesdropping claim because the person -- the transmission was captured while it was happening. So the --

**THE COURT:** I think there's a different statute that addresses that when you record and actually do it.

But what if you call and you answer the phone and it's right there, so it's going through, but I walk to the house next door, so I'm not listening. And then you came back and you hang up. Is that listening to it?

**MR. DWOSKIN:** I think the difference between that and what you just described is that the material has sort of left that device, as it were, and it's now making its way in transit, so it's sort of a -- it's not ephemeral. You just --

**THE COURT:** Instead it goes to my voicemail, and it records there. And then I go back and I listen to the voicemail. Is that eavesdropping? No, it's different, that's a recording. I think that's a different statute.

Okay. All right. I have another matter, so let's -- on the UCL claim --

**MR. DWOSKIN:** Just to -- sorry. There's also attempted to learn, attempted to learn.

**THE COURT:** You don't have any allegations that they attempted to learn it. That's an amendment issue, though. It's not a with prejudice, right? Those allegations aren't there.

On the UCL standing, what are the plausible allegations that her inference has value? There's no market for her to sell her information. It's about her hotel purchasing practices or habits, right?

01:21:30 **MR. DWOSKIN:** So I think there's sort of two types of economic loss that one could -- maybe more than two types, but there's a diminution in value theory of economic loss, and that sort of line of case law looks at, you know, is there a market for this data and have you alleged that, you know, the person -- so we do allege that there's a market for --

01:21:53 **THE COURT:** Where are those allegations? I'm not aware of it. Maybe I can make some more money.

01:22:00 **MR. DWOSKIN:** Are you talking about specifically for guest records?

01:22:02 **THE COURT:** For your plaintiff. It's her case, your case.

01:22:05 **MR. DWOSKIN:** There's a general market for -- you know, I'll point you to the allegations, but I know Your Honor doesn't think that they're sufficient. But I might as well just cite them for the record. For the value of the data taken, that would be on paragraph 56 down to --

01:22:26 **THE COURT:** That's the value to Sojern. It's paragraph 56.

01:22:31 **MR. DWOSKIN:** That whole section, and we also include an allegation of how you might quantify the value --

01:22:37 **THE COURT:** I understand how you might quantify.

01:22:40 The question is: How might she --

01:22:43 **MR. DWOSKIN:** Right. So that goes back to the -- sort of the two different theories of economic loss that are sufficient for or can be sufficient for standing under the UCL. You have one bucket, which is the diminution in value theory, and that theory really looks at what you're describing, Your Honor, which is the market for the data, did she participate in that, and did she lose something with respect to that?

01:23:06 Then, there's a different theory of economic loss under the UCL, which is more of a benefit of the bargain theory: Does my data have value? Does it -- is it -- is her booking information valuable?

01:23:21 And then she gave it, she was forced to give it to Sojern without compensation. And so that is the theory that we're advancing here, which was -- it's the same economic injury as *In Re Meta Pixel Tax*.

01:23:43 **THE COURT:** All right.

01:23:44 **MR. PERSSON:** They haven't alleged that, number one. Number two, that sort of benefit-the-bargain theory is typically rejected in data breach cases, and it wouldn't be any different here. She hasn't alleged any diminution. She hasn't alleged that somehow she's been impaired or -- I mean, what she's really talking about there is almost an unjust enrichment theory.

01:24:06 But, again, there's no benefit that she inferred on Sojern and there's not a showing of Sojern retaining that benefits unjustly. I understand I jumped to another cause of action, but that's really what she's arguing there.

01:24:17 **THE COURT:** Well, she alleges that Sojern did get her information. I mean, she alleges it generally and that they used it to develop new products at least.

01:24:28 **MR. PERSSON:** Or to improve their own products.

01:24:30 **THE COURT:** Yes, alleged that they use it to advertise or that they sell it.

01:24:36 **MR. DWOSKIN:** So in terms of -- we say that they use it for their own internal purposes, including for their own research and development.

01:24:45 **THE COURT:** Yeah, but they don't sell it.

01:24:47 **MR. DWOSKIN:** We don't allege that they sell it, that is correct.

01:24:51 **THE COURT:** So I'm not -- I don't know if their own -- to develop new products. Like what products?

01:25:00 **MR. DWOSKIN:** Their own services, which is how they make their technology more effective. Essentially, what Sojern is doing is -- in their motion to transfer, they acknowledge the receipt of guest records and booking information, and they say they use it to understand conversions to measure the effectiveness of advertising

01:25:23 for the hotels. That's, you know -- and so what
01:25:27 they're -- they're improving their products to see how
01:25:30 effective their advertising is.

01:25:31 **THE COURT:** All right. The 51.5(a) argument,
01:25:38 doesn't that statute only apply to innkeeper? It doesn't
01:25:41 apply to Sojern?

01:25:45 **MR. DWOSKIN:** So the guest record statute? So
01:25:47 our theory there -- you know, the guest record statute
01:25:51 plays a sort of narrow role in this case, I would say,
01:25:53 Your Honor.

01:25:53 **THE COURT:** Okay. So just answer the question.
01:25:55 Does it apply to Sojern or not? Are they -- do they fall
01:25:57 within the definition of whom it applies to?

01:26:02 **MR. DWOSKIN:** Our theory there would be Hilton
01:26:05 violates it and that Sojern can be responsible on an
01:26:10 aiding and abetting theory similar to *Mata v. Zillow*
01:26:15 because they provided substantial assistance to the
01:26:17 violation.

01:26:17 **THE COURT:** All right. And I'm not sure I
01:26:23 follow the federal wiretap argument.

01:26:28 **MR. PERSSON:** That's a one-party consent and --

01:26:32 **THE COURT:** Hilton consented.

01:26:34 **MR. PERSSON:** By installing Sojern's software.

01:26:37 **MR. DWOSKIN:** Right. So you know, similar --
01:26:40 one second.

01:26:46 So this is similar to the *Meta Platforms* case. On the one hand, Your Honor, if Your Honor doesn't consider the consent issue or even if Your Honor looks at the Hilton documents or the Marriott documents, they'll say they disclaim the sharing of guest records, so I think, you know, Hilton's consent is --

01:27:07 **THE COURT:** But it was injured because it was collected by Hilton to begin with, but Hilton consented to that. Now, if they shared it with Sojern in violation of something, that's your claim against Hilton that you've dismissed without prejudice. But how is that a federal wiretap?

01:27:26 **MR. DWOSKIN:** Our allegation here is, you know, that Sojern directly has harmed our plaintiff by eavesdropping among other things. And so under the ECPA, which there is an exception to the one-party consent rule which is if the conduct violates another law, essentially, and here we have alleged several violations of another law, including Zippa, including the guest records statute.

01:28:02 **THE COURT:** Okay.

01:28:02 **MR. DWOSKIN:** We've alleged invasion of privacy, other intentional torts, so we think that that -- we have pled enough to establish an exception to the one-party consent rule under the ECPA.

**MR. PERSSON:** Your Honor, *Meta Platforms* said something different than what he's saying. What happened in *Meta Platforms* was Meta was receiving personal health information without the knowledge of the HIPAA-covered entity that it installed the Meta pixel on the site. And so unlike here where Hilton knew what information Sojern was receiving, the independent tortious conduct that he's referring to was that Meta may have been -- and this was the pleading stage -- may have been receiving stuff unbeknownst to the HIPAA-covered entity, so that's what differentiates that case.

**THE COURT:** Okay. All right. I've got a lot to chew on. Thank you for the argument.

**MR. PERSSON:** Thank you, Your Honor.

**MR. DWOSKIN:** Thank you, Your Honor. Have a great day.

**THE COURT:** We're going to take a five-minute break, and then we'll do LyricFind.

(Adjournment.)

# C E R T I F I C A T E

I, TINA DuBOSE GIBSON, do hereby certify that the foregoing 44 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the motions hearing held on the 21st day of August, 2025, in the matter of:

SUELLEN CRANO, Individually
and on behalf of other similarly
situated individuals
vs.
SOJERN, INC.

Dated this 27th day of October, 2025.

S/Tina DuBose Gibson
_______________________
TINA DuBOSE GIBSON, RPR, RCR
Official Court Reporter
United States District Court
Western District of Tennessee